No. 29,141.

In re RAYMOND HOLLIS; FRED HOLLIS et al., *Appellants,*
v. M. C. BROWNELL et al., *Appellees.*

(284 Pac. 388.)

Opinion filed February 8, 1930.

*W. B. Crowther,* of Salina, for the appellants.
*David Ritchie,* of Salina, for the appellees.

The opinion of the court was delivered by

JOCHEMS, J.: This action was originally filed April 16, 1927, in the juvenile court of Saline county upon complaint made by M. C. Brownell, grandfather of Raymond E. Hollis. In the complaint it was charged that the said Raymond E. Hollis was dependent and had no proper parental care or guardianship, and was neglected, and that the father, Fred Hollis, was an unfit person to take care of said child. The case was tried in the juvenile court and judgment entered therein awarding the custody of the child, Raymond Hollis, to its grandfather, M. C. Brownell, the complainant.

Thereafter an original proceeding in habeas corpus was filed in this court, seeking to have the child taken from the custody of M. C. Brownell on the ground that the complaint filed in the juvenile court was insufficient to give jurisdiction to that court. This question was disposed of in the case of *In re Hollis,* 124 Kan. 345, 259 Pac. 793, in which decision the complaint was held sufficient to give the court jurisdiction.

After the judgment was entered in the juvenile court an appeal

was taken by the father, Fred Hollis, on May 12, 1927. Trial was had in the district court pursuant to this appeal and several days were consumed in the trial of the cause. At the conclusion the custody of the child was awarded to its grandfather, M. C. Brownell. From this judgment the father, Fred Hollis, has appealed to this court.

A voluminous abstract of 192 pages, setting forth substantially all the testimony introduced in the trial of the district court, is brought here for our review. To attempt to digest this testimony within the proper limits of an opinion is impossible, so we will discuss it only in a general way.

The mother of the child died on April 12, 1927. She committed suicide. On the day of her death, sometime in the afternoon, her husband, Fred Hollis, and his parents, and a neighbor, Mrs. Anderson, met at the home of Fred Hollis and his wife, Harriet Hollis. The wife, Harriet, was the daughter of the complainant, M. C. Brownell. At this meeting in the afternoon a discussion was had with Harriet Hollis by the parties present, in which they all participated, relative to alleged misconduct on her part, the misconduct charged being that of clandestinely meeting a man who came to the home frequently when the husband, Fred Hollis, was away. Following this discussion it was agreed that the husband, Fred Hollis, should go home with his parents, who lived in the country about five miles from Salina; that the wife, Harriet Hollis, should take the little boy Raymond with her and go to the home of her parents; that they should live apart for a week or so and then get together again and see whether an arrangement could not be worked out whereby they would continue to live together as husband and wife. This appears from the testimony of the Hollis family. Following this meeting Harriet Hollis went to the home of her parents, Mr. and Mrs. Brownell, and took Raymond, the child, with her. She left within a short time, saying that she was going downtown. She went to a drug store, purchased some strychnine, went back to her own home and there took the strychnine. This was in the evening. She then told a neighbor to call her folks.

At the time of her death the child was with the grandfather, M. C. Brownell. On the day following her death the father, Fred Hollis, went to the home of the grandparents and told them he had come after his boy. The grandfather urged the father to let the little boy stay with them, at least until after the funeral, giving

as his reason that the grandmother was ill and that her love for her daughter, who was now deceased, had all gone out to the little boy; that it would be a great blow to her to take him away at that time. The father agreed to leave the child, but took him out on that occasion for a ride. After about an hour he brought him back and left him with the grandparents. On April 16, prior to the burial of Harriet Hollis, and under the above circumstances, the grandfather, M. C. Brownell, swore to, and caused to be filed, the original complaint in the juvenile court of Saline county, as above noted.

There is a vast amount of evidence in the record which pertains only to the character and reputation of the parents of Fred Hollis. There is likewise testimony in the record concerning the character and reputation of the father, Fred Hollis. The case was tried by the court apparently on the theory that it was before the court for the sole purpose of determining what was for the best interests of the child. The conduct of the trial and the admission of evidence indicated this.

The juvenile court as established by the laws of Kansas is one of special and limited jurisdiction. R. S. 38-401 defines the jurisdiction of the juvenile court as follows:

"That there be and hereby is created and established, in each county of the state, a court to be known as the 'juvenile court,' whose jurisdiction shall pertain to the care of *dependent, neglected* and *delinquent* children. . . . Said court shall have jurisdiction over all cases concerning dependent, neglected and delinquent children in their respective counties."

R. S. 38-402 provides that the act shall apply only to children under the age of sixteen years, and specifically defines the words "dependent" child, "neglected" child and "delinquent" child.

The only issue before the juvenile court when it tried the case was whether or not Raymond Hollis was a dependent child, a neglected child, or a delinquent child, within the definition of the statute. When the case was appealed to the district court it had only the jurisdiction of the juvenile court. The district court on this appeal had only the power to try the case *de novo*, subject to all the limitations as to jurisdiction and issues which bind the juvenile court. In trying this case the district court could not expand its jurisdiction to that of the district court in hearing an action for divorce which involves the custody of children. It could not exercise the broad powers and authority conferred upon it in divorce actions to determine what was for the best interests and welfare of

the child. It could only pass upon and determine such matters as are properly within the jurisdiction of the juvenile court. (R. S. 38-412. See, also, *State v. Dubray*, 121 Kan. 886, 250 Pac. 316.)

Was the evidence in this case sufficient to establish that the child, Raymond Hollis, was a dependent child, a neglected child, or a delinquent child, within the meaning of the statute? (R. S. 38-402.) We think not.

The evidence showed that the parents of Raymond Hollis had lived together as husband and wife; had maintained a comfortable little home; had an automobile; that the debts of the father were all paid; that he had during his married life maintained a small bank account upon which his wife was permitted to check at her pleasure; that this little home was so maintained up to the time of the death of the mother. The evidence showed that the father had on one occasion, when working at a filling station, taken care of the little boy in the afternoon while the mother was out working at the job she had. Witnesses testified that he apparently took care of the child all right. There is testimony in the record to the effect that on a number of occasions the father took the little boy into pool rooms with him, and that on one occasion he let the little boy sit on a bench while he played a game of pool. There is some evidence that the father and mother had had trouble on several occasions because the father charged the mother with improper relations with another man, but the evidence does not show that any quarrels took place in the presence of the child, and failed to show that the father in any way abused the boy or mistreated him. In an effort to show that the father was an unfit person to have the custody of the child, several witnesses were introduced charging him with immorality. The principal witness on this point was a young woman, twenty years of age, married, who had a child born before marriage, and who at the time of the trial was confined at the Industrial Farm for Women, at Lansing, with a venereal disease. We do not deem this testimony of importance, inasmuch as this evidence did not bear upon the issues as to whether the boy was dependent, neglected or delinquent. The fact that the father took the boy into a pool hall on several occasions, especially in view of his explanation that he took him in for the purpose of going to the toilet, does not bring the child within the definition of the statute which, in defining a delinquent child, uses the words: "or who knowingly patronizes any pool rooms or places where gambling devices are operated." (R. S. 38-402.)

Under the evidence as shown by the record in this case we think it was insufficient to show that this child, Raymond Hollis, was a dependent child, or a neglected child, or a delinquent child within the meaning of the statute. It must be borne in mind that up to the time of the death of the mother, the father had furnished a home for the child; that following the death of the mother he went to the grandparents' home to get his child, but that the grandfather persuaded him to leave the child. There is no substantial evidence that the father was anything but a good father to the child prior to the mother's death. It is true that there is some evidence that on one occasion he punished the boy with a yardstick, but the witness who testified to this said she did not think he was severe in his punishment. As a matter of fact, there would probably be a great many less delinquent children to occupy the time of the juvenile courts if some more drastic means of correction were more frequently applied by parents to their children. It may not be far afield to remark that probably one of the causes of so much delinquency nowadays is largely attributable to the fact that parents have in most instances gotten away from the good old-fashioned custom of meting out proper corporal punishment to their children when needed.

To allow the judgment of the lower court to stand in this case, it seems to us, would be the equivalent of saying that at any time a home is broken up by the death of the mother, the maternal grandparents might rush in and take the children away from the father. The reverse might apply in case of the death of the father. This is not the law. Because a home is visited by the misfortune of death, can we at once say that the husband, being left without his mate, is no longer able to provide a home for his children? There are too many instances within the common knowledge of all, where under such circumstances the father has risen to the occasion and has, by force of the situation in which he finds himself, made a far better parent for his children than he had been prior to the death of the mother. Is it fair to say that Fred Hollis, without having had any chance to demonstrate whether or not he would properly look after his child, should not have his custody under the circumstances in this case? We think not.

The child was not dependent, because he was not "destitute, homeless or abandoned," nor did he come within any of the other classifications enumerated in the statute. Neither was he a delinquent child.

We have noted with considerable interest the brief of the appellee, in which he sets forth the decisions of this court which set out and establish the best interests and best welfare doctrines. We note with renewed interest his citation of the splendid decision of this court, written by our beloved jurist, Justice Brewer, in the leading case *Chapsky v. Wood*, 26 Kan. 650. However, under the circumstances which existed in the present case, we feel that these authorities do not apply. R. S. 38-201 provides:

"The father and mother are the natural guardians of the persons of their minor children. If either dies or is incapable of acting, the natural guardianship devolves upon the other."

In *Swarens v. Swarens*, 78 Kan. 682, 97 Pac. 968, it was said:

"The law regards the father, where, as in this case, the mother is not living, as the rightful custodian of his child against the claims of all others. This right might, of course, be forfeited by conduct of the father showing him to be manifestly unfit to have the custody and care of his child. Courts, in the interest of minor children, may take them from their parents and place them elsewhere, even in the custody of strangers; but in the exercise of this extraordinary power the rights of the parent must be recognized and protected."

In *In re Hollinger*, 90 Kan. 77, 132 Pac. 1181, it was said:

"The right of a parent to the custody of his child will often yield to consideration of its welfare. But special circumstances must exist in order to open the way to an inquiry in that regard. A court may not assume to disturb normal family relations merely upon a belief that it can thereby improve existing conditions." (p. 78.)

In *Buchanan v. Buchanan*, 93 Kan. 613, 144 Pac. 840, it was said:

"This little boy will lose much by the disruption of the family and the deprivation of a father's counsel and care. To these great losses the court will not add separation from a mother's companionship and care merely because a more prosperous home, with better financial resources, is open to him." (p. 616.)

See, also, *In re Ziegler*, 103 Kan. 901, 176 Pac. 974; *Crews v. Sheldon*, 106 Kan. 438, 186 Pac. 498; *Denton v. James*, 107 Kan. 729, 193 Pac. 307; *Jendell v. Dupree*, 108 Kan. 460, 195 Pac. 861.

The judgment of the district court is reversed with instructions to enter judgment in accordance with this opinion, awarding the custody of the minor child, Raymond E. Hollis, to his father, Fred Hollis.

JOHNSTON, C. J., dissenting.

BURCH, J., concurs in the result.