No. 37,005

In re Donita Trent, a minor (KATIE TRENT, Custodian, *Appellant,* v. NINA TRENT BELLAMY, *Appellee*).

(190 P. 2d 400)

Opinion filed March 6, 1948.

*T. A. Sullivan* and *R. E. Angle,* of Wichita, were on the brief for the appellant.

*L. M. Kagey,* of Wichita, was on the brief for the appellee.

The opinion of the court was delivered by

HOCH, J.: We have here a contest over the custody of a minor child. The child's paternal grandmother appeals from an order of the district court sustaining the juvenile court, which held the child to be a neglected child and awarded custody to the child's mother. The principal questions presented are whether the juvenile court had jurisdiction to make the order, custody of the child having been awarded a short time prior thereto in a divorce proceeding in the district court; and whether there was evidence to support the finding of the juvenile court, thereafter sustained by the district court, that the child was a dependent and neglected child within the meaning of section 38-402, G. S. 1935.

On March 12, 1946, a divorce was granted to Virgil Trent from Nina Trent in the district court of Sedgwick county, second division.

The custody of Donita Trent, a child then about three and one-half years old, was given to Katie Trent, the paternal grandmother, the court having found that the mother was not a fit and proper person to have custody of her child. Two days thereafter, on March 14, 1946, Nina Trent and Jack Bellamy were married in Kansas City, Mo. In September, 1946, they returned to Wichita, and the mother then filed a motion in the divorce action asking that the child's custody be taken from the grandmother and given to her. On September 18, 1946, the motion was denied after hearing, and in denying the motion the court said:

"When all things are equal, the mother would be entitled under the law to the custody of this child. The facts in this case disclose that the residence of the mother is uncertain; they don't know where they will be from one time to another. She was married two days after the decree was entered here which does not commend her very favorably to the court.

"During the time this child needed her most, she was not taking care of it. I cannot see that the welfare of the child would be improved any by moving it. The question in the court's mind is whether it would be as well cared for as it is now. The motion is denied. . . ."

Five days thereafter and on September 23, 1946, Nina Trent Bellamy filed a complaint in the juvenile court of Sedgwick county alleging:

"That said child is dependent; has no proper parental care or guardianship—has idle and immoral habits—or whose home, by reason of neglect, on the part of its parents, guardian or other person in whose care said child is kept, is an unfit place for said child Donita C. Trent. . . ."

Trial was had in the juvenile court and on September 25, 1946, the juvenile court adjudged the child to be a neglected child, took custody from the grandmother and awarded it to the mother. From this order an appeal was taken on September 30 to the district court, first division. Trial was there had on April 25, 1947, and after evidence had been received the case was continued to May 19, 1947, for purposes of argument. On May 10, 1947, nine days prior to the day set for argument, the district court wrote a letter to the attorneys stating that he was sustaining the findings and judgment of the juvenile court. Motion for new trial was made and overruled, and this appeal followed.

We first consider the question of jurisdiction. The jurisdiction of a district court in a divorce proceeding, as to the custody of minor children, is a continuing jurisdiction. (*Phillips v. Phillips*, 163 Kan. 710, 712, 186 P. 2d 102, and cases there cited.) Upon the

question of whether such continuing·jurisdiction in divorce actions precludes the subsequent acquisition of jurisdiction of a minor child by another court, there is some conflict of authority. The question is treated at some length in an annotation in 146 A. L. R. 1154, supplementing in part an annotation in 11 A. L. R. 147 and 78 A. L. R. 317. ·

While the general rule seems to be that the jurisdiction of the district court in a divorce action is both continuing and exclusive, precluding any other court in the same state from thereafter acquiring or exercising jurisdiction over the same subject (146 A. L. R. 1155), this rule is quite generally held not to apply to jurisdiction of a juvenile court over children found to be dependent or neglected within the meaning of the state statute. In 11 A. L. R. 147 it is said, citing cases from a number of jurisdictions in support, that:

"The assumption of jurisdiction by a juvenile court over a child, in conformity to a statute expressly conferring on that court the power to determine the custody of a neglected or delinquent child, has been frequently held to end, or to prevent the assumption of, jurisdiction over such child by another court."

In 78 A. L. R. 317 it is said:

"While, as stated in the original annotation in 11 A. L. R. 147, the powers conferred by statute upon a juvenile court have been liberally construed in respect to the purpose for which the court was created, the courts in the more recent cases have manifested a distinct tendency to confine the jurisdiction of the juvenile courts within the limitations imposed by statute, namely, to cases involving neglected or delinquent minors, and not to encroach upon the jurisdiction in respect to minors theretofore existing in courts of general jurisdiction."

Early after enactment of our juvenile court law this court held that where the juvenile court acquires jurisdiction of a neglected, dependent or delinquent child, the jurisdiction of the district court in the divorce action is thereby terminated. In *In re Hosford,* 107 Kan. 115, 190 Pac. 765, the court gave recognition to the continuing jurisdiction of the district court in a divorce action to supervise the custody of minor children, to the exclusion of other courts, generally. But it was held that a juvenile court stands upon a very different footing, being given specific statutory jurisdiction "over all cases concerning dependent, neglected and delinquent children." It was said in the opinion:

"If, for instance, a boy whose custody had been awarded by the district court to his father should by reason of some serious delinquency be regularly

committed by the juvenile court to the state reformatory, assuming that to be authorized by the statute (Gen. Stat. 1915, § 3073), or,—as often happens—to the state industrial school, it would seem quite out of keeping with the general plan of administering such matters if the duration of his stay there could be controlled by the district court in virtue of its reserved jurisdiction, and that situation would not be essentially different from the one here presented, so far as relates to the jurisdiction of the district court, for even such a commitment would not be for the purpose of punishment, but for the welfare of the child. (*In re Turner,* 94 Kan. 115, 145 Pac. 871.)" (p. 118.)

Cases from various jurisdictions were cited in the Hosford opinion and the following quotation was made from the case of *State v. McCloskey,* 136 La. 739, 741:

"The juvenile court and the court in which a suit in separation from bed and board is pending between the parents of a child may have simultaneous, though not concurrent, or conflicting, jurisdiction of the custody of the child; that of the juvenile court to be exercised as between the state, or, so to speak, the child, and the parents of the child; and that of the other court to be exercised as between the two parents. In the instant case, on the assumption of the child Iska McCloskey not being a neglected child within the meaning of that term as defined by the constitution (article 118, § 3), the juvenile court is utterly without jurisdiction of her custody, and the civil district court has exclusive jurisdiction. On the contrary assumption, the juvenile court has jurisdiction." (p. 120.)

The Hosford case was cited with approval in *Hardesty v. Hardesty,* 150 Kan. 271, 274, 92 P. 2d 49, and *Wilcox v. Fisher,* 163 Kan. 74, 78, 180 P. 2d 283. While the issues and the facts were not precisely the same in those cases as in the Hosford case, they presented similar questions and followed that case as to the exclusive original jurisdiction of juvenile courts over dependent or neglected children as defined by our applicable statute.

It follows that the juvenile court in this case could acquire jurisdiction of the minor child and thereby oust the then existing jurisdiction of the district court in the divorce action. However, this can only be done upon a finding based upon substantial evidence that the child was neglected and dependent within the statutory definition.

This brings us to the question of whether the finding by the probate court that the child was "neglected," which finding was adopted by the district court, was supported by substantial evidence.

Pertinent portions of section 38-402, G. S. 1935, which defines dependent and neglected children within the meaning of the juvenile court act, are as follows:

"This act shall apply only to children under the age of sixteen years, not now or hereafter inmates of any state institution or any industrial school for boys or industrial school for girls or some institution incorporated under the laws of the state: . . . For the purpose of this act, the words 'dependent child' and 'neglected child' shall mean any child who for any reason is destitute or homeless or abandoned, or dependent upon the public for support, or has not proper parental care or guardianship, and has idle and immoral habits, or who habitually begs or receives alms, or who is found living in any house of ill fame or with any vicious or disreputable persons; or whose home, by reason of neglect, cruelty or depravity on the part of its parents, guardian or other person in whose care it may be, is an unfit place for such a child; . . ."

We have no hesitancy in saying after carefully examining this record that there was no substantial testimony whatever to support the finding that this child was dependent and neglected within the meaning of the statute.

As heretofore noted, the district court nine days prior to the change of custody by the probate court had reaffirmed, after hearing, its prior award of custody to the grandmother and its denial of custody to the mother on the ground that she was not a fit and proper person to have custody. The testimony in the district court had related in part to alleged indiscretions, immoral in character, on the part of the mother. However, that does not preclude the mother from subsequently showing, in a proper proceeding, that she is worthy to have the custody of her child.

The probate court made an extended statement, when it entered its order of September 25, 1946, taking custody from the grandmother and giving it to the mother. Examination of that statement makes it perfectly clear that the only thing upon the mind of the court was whether it was best for the child and for all parties concerned to have custody taken from the grandmother and given to the mother. The question of whether the child was a neglected, dependent or delinquent child received very slight attention. The probate court said in part:

"The hardest job I have is just settling such cases as this. There is going to be a lot of heart aches over this sometime or other. The biggest mistake any one can make, whether they are grandparents or whether they are total strangers, is to take someone else's child with the intention of keeping it, unless, they at the time they take it, or shortly thereafter, adopt the child and sever all relationship so they will have some security about it.

"Now these grandparents have this child, and have the custody of it, *and no doubt gave it a good home; there isn't any question about that. Now they are good people, there has not been evidence to the contrary and they have furnished it with everything it wants.* But in that custody, you don't

have any security. The longer the child is with you, the more attached you are going to become to it and you are worried all of the time, the grandmother is, I think I make a correct statement on that, that something is going to happen and somebody will kidnap the child and take it away from her or she will lose it. . . . Take this little girl starting in now four and a half years and evidently there is going to be more litigation coming up, and the girl is getting older so she understands this thing, understands this fight over her custody, what kind of a life is that going to be for the child? Then there is the other side of it. A woman risks her own life to give birth to a child. Most of the women in the court room have done that. Now should the court, and I don't care whether it is this court or any other court, reach out its strong and powerful arm and take the child permanently away from the mother? Do you think so? That is a pretty serious thing for the court to do. . . .

"This mistake is made so often and it comes to my attention, usually with grandparents, they do love their grandchildren, there isn't any question about that and they want to give the child everything that they can, or the grand-children everything that they can. I am thinking the child is spoiled. I don't think they have extra good control of it. . . You may say, 'This is the father'. I don't know the father's attitude; he has not asked for anything or apparently taken any part in this. I can overlook any mistake that the father has made in his young days and that the mother has made in her young days. What I am interested in, is what kind of people are they now, and what are they going to do from here on out; what kind of people and citizens they are going to be from here on out. The mistakes the father made when he was young and the mistakes the mother made when she was young don't get any place with me; I know people change. . . I know the grandmother thinks that nobody can do it like she can and she would do a good job, there isn't any question about that, but she might overdo it; she will do what she thinks is best, best for the child but it might not be the very best for the child, and for that reason she will overdo it.

"But going back to the *main thing as I see it is the security in the custody of the child,* that you never have any security, as bad as it hurts me to say that. Somebody that has had a child and done a great deal for it and loved it and worshipped it you might say, that that relationship cannot continue and it is just not the best thing for you folks and in time to come, . . .

"When it comes to neglect, if the child used the language that these people say—and it was not only the Bellamy's that said that—it was two or three other witnesses—neglect in my opinion could be overdoing the thing. This child gets everything it wants; everything it asks for; and in my opinion it has its own way in everything to the detriment of the child.

"I realize this, too, about some of the testimony, that when the child is with the mother and she is loving the child and the child is loving her, that her mother is the greatest person in the world at that particular time and when it is with the grandmother and getting everything it wants and she is bestowing everything on it that it desires, then the grandmother is the great-est person that ever lived, I realize that. It would be my opinion that so

far as love and affection is concerned that the child, so far as a child that age is capable, it thinks the world and all of both of them. . . .

"MY FINDING IN THIS CASE WILL BE THAT THE CHILD IS NEGLECTED; and I have told the best I can what I mean by neglect; *not that they have abused it, not that they have not furnished it what it wants,* and the custody should be with the mother." (Italics supplied.)

It is noted that the probate court stated that it had told as best it could what it meant by "neglect." Only two things were stated which could even remotely be considered as a basis for the court's opinion that the child was "neglected" within the meaning of the statute. One was that the mother and two or three other people had on a few occasions heard this little child three or four years old use some dirty words. The second, that the probate court felt that the grandmother had probably furnished the child too many toys and other things and thus was "spoiling" it. These matters require little discussion. Several witnesses testified that they had frequently been in the home of the grandparents and had never heard the child use vile and indecent language and that the child was a well behaved child. In the district court, appellant offered further testimony along this line from various competent witnesses, including an affidavit by the little girl's Sunday-school teacher who said that she went to Sunday school to her for three and a half years prior to September, 1946, and was always neatly dressed and clean, and never at any time in her presence used any vile and indecent language. This is noted not for the purpose of weighing conflicting evidence, which is not our function, but to call attention to the trivial nature of the grounds relied upon. The district court refused to hear further evidence and, as heretofore noted, announced its decision prior to the date set for argument. But assuming that the child did on occasion use dirty words, that certainly is insufficient to establish jurisdiction over the child by the juvenile court. Particularly so when no contention was then made or is now made that the dirty words were learned in the grandmother's home. There are few, if any, parents who have not been shocked from time to time by improper words, picked up somewhere and used, often without understanding, by their young children. It would be absurd to hold that such isolated instances furnish a basis for finding a child "neglected" under the statute.

The only other basis for finding the child neglected, which we can find in the probate court's statement, is the court's fear that the

grandparents would "spoil" the child by furnishing it too many toys and other things and doing too much for it. If all children, thus "spoiled" or who in the opinion of a court are thus likely to be spoiled, are to be considered neglected and subject to the juvenile court law, our juvenile courts would find their business considerably enlarged. There was some evidence, largely hearsay, about unfortunate conditions in the home of the grandparents with others residing there, but the trial court did not base its finding upon any matters of that sort nor do we find anything in that testimony to justify the finding.

In *Hollis v. Brownell,* 129 Kan. 818, 284 Pac. 388, a finding of the trial court that the child was a dependent and neglected or delinquent child, was reversed on the grounds that the evidence was insufficient to uphold such a finding. Without reviewing fully the record in that case, it may be said that the evidence upon which the trial court made those findings consisted mainly in the testimony that the father had taken his little boy into pool rooms with him and that on one occasion he had let him sit on the bench while he played a game of pool; that the father and mother had had some trouble sometime, growing out of the father's charge that the mother had had improper relations with another man. This court held that this and some other testimony of similar nature was not sufficient, in view of other testimony with reference to conditions in the home, to show that the child was dependent, neglected or delinquent, within the meaning of the statute. (See, also, *McGrath v. Vail,* 140 Kan. 312, 37 P. 2d 3.)

Although upon appeal from the juvenile court the district court tries a case *de novo,* it has no broader jurisdiction in the premises than the juvenile court, and is subject to the same limitations as to issues. (*Hollis v. Brownell,* supra; *State v. O'Keith,* 136 Kan. 283, 285, 286, 15 P. 2d 443.) The evidence in the trial court being wholly insufficient to support a finding that the child was either neglected, dependent or delinquent, within the meaning of the statute, the court was without jurisdiction to award custody of the child. This conclusion makes it unnecessary to consider other incidental issues presented for review.

The judgment is reversed with direction to the district court to set aside the finding and order of the probate court.