No. 35,370

Doris Jones, *Appellant*, v. Manford Jones, Jr., *Appellee*.

(124 P. 2d 457)

Opinion filed April 11, 1942.

*Kenneth H. Foust,* of Iola, argued the cause for the appellant.

*Guy Lamer,* of Iola, argued the cause, and *DeWitt M. Stiles,* of Iola, was on the briefs for appellee.

The opinion of the court was delivered by

Harvey, J.: This was a divorce action. The appeal is from an order denying plaintiff the custody of her child by the marriage.

The pertinent facts shown by the record may be summarized as follows: Plaintiff was reared in Yates Center, Woodson county, and defendant at Toronto, in the same county. The father of each of them worked for the Missouri Pacific Railroad Company. The parties were married September 3, 1930, when she was fifteen and he twenty years of age. They went to live with his parents. He was employed as a section hand by the railroad. Their only child, Madelene Irene Jones, was born May 6, 1932. They continued to live with his parents for two or three years—the time is not definitely shown. He was a drinking man, would get drunk, and at such times was quarrelsome and abusive. He quit his job, or was fired, and sought work in the oil fields, but was able to hold a place but a short time. They moved frequently, "to a dozen different places, did not stay any place very long." Left without funds, she would take her baby and go sometimes to the home of her parents, but more frequently to the home of his parents. "We lived practically all the time we were married with his parents, because I never had a

home of my own." (Excerpts from plaintiff's testimony.) They separated finally in September, 1938, and she sued for a divorce. Pending the hearing plaintiff sought work to support herself. There is testimony of a tentative understanding the child would be left and looked after for a week or two by plaintiff's mother and then for a similar time with defendant's mother, but plaintiff's mother was in poor health and most of the time defendant's mother kept and cared for the child. The divorce was contested. The trial was had November 29, 1938. There was abundant evidence of gross neglect, extreme cruelty, and frequent intoxication on the part of defendant. There was no evidence tending to show misconduct of plaintiff. She was asked and answered the following questions:

"Q. And do you have a home at this time to which you could take this child? A. Well, I have my mother's home, but my mother isn't in very good health, and I couldn't be there all the time, I know, and it is a hard proposition for a person as old as—that is, not a young person, to be a mother to a child her age.

"Q. Would you like to have the care and custody of this child? A. Yes, sir; I would.

"Q. And now just tell the court something about the relations or the treatment, if you know, that child is receiving from her grandmother at this time. A. Well, I know she is receiving good care. I know if she got sick she would have the best care in the world, but for the people that are around her, I think she should be taken care of morally as well as in every other way, and I don't think that all this drinking and quarreling and fighting that goes on there is the best for any child, I don't care who it is."

At the close of the evidence the following occurred:

"By the Court: The evidence seems to show that this father is not a very good citizen, husband or father, either one. The plaintiff, of course, has made out a plain case for divorce. There seems to be nothing against the plaintiff as far as the evidence shows. She seems to be all right. The only thing about it is this child.

"Counsel for plaintiff: As soon as she can get squared around, she will make an application and a showing that she has a home and a place where she can take this child.

"By the Court: I will continue this matter over until December 6, 1938, at 2 o'clock p. m."

On December 6 the parties filed with the court a written stipulation by which they agreed "that the care, custody and control of the minor child of said litigants, Madalene Irene Jones, shall be given over to Mabel Jones of Toronto, Kan., grandmother of said child, pending further orders of the court with respect to said child's care, custody and control." The stipulation further provided that

each of the parties might visit the child, who should be kept in school, and that the defendant, "in conjunction with his mother," would provide sufficient money to clothe and maintain the child. Defendant's mother, Mrs. Mabel Jones, signed the stipulation accepting the duties imposed on her thereby. This stipulation was considered and approved by the court on December 6, 1938. Plaintiff was granted a divorce, and custody of the child was given to defendant's mother, Mabel Jones, pending the further order of the court.

Early in 1941—the exact date not shown—plaintiff filed in the divorce action an application for an order modifying the previous order respecting the custody of the child and asking that she be granted the care, custody and control of the child. In this she alleged that at the time the divorce was granted she was not financially able to care for the child and for that reason consented the custody be given temporarily to defendant's mother; that it was not her desire to be separated from her daughter; that she is now able to care for the child; that she is married again; that her present husband is permanently employed, and that she will care for the child and provide for her, for whom she has great love and affection.

This application came on for hearing by the court April 29, 1941, and was opposed by the child's grandmother, Mrs. Mabel Jones. The plaintiff testified that she is the former wife of Manford Jones; that most of her married life was spent at the home of his parents; that when her divorce was granted she signed a stipulation permitting her daughter to be left with Mabel Jones, her grandmother, with the understanding it was just to be a temporary order; "that was what they told me." At that time she was working and providing for herself and had no place established where she could take care of her daughter. The child has been with her grandmother since they were divorced, and has been well taken care of and going to school. Since appellant's divorce she had been working and making her own way. She worked in a dentist's office in the Commerce Building in Kansas City and for W. C. Simons, a newspaper man at Lawrence. "I have seen my child just as often as I could."

On August 14, 1940, she was married to Louis Blohm, twenty-five years of age, who had lived practically all his life at Piqua (in Woodson county), where he was a garage mechanic. He went to Kansas City to school and they sent him to San Diego, Cal., where he is employed by the Consolidated Aircraft Corporation, working

in an airplane factory. He helps to build and assemble planes. He has steady employment, and his salary is from $35 to $45 per week. They live at Ocean Beach, Cal., about six miles from San Diego, where he works. They have a four-room, modern home, which they rent. It is neatly decorated, in good repair, all modern throughout, and has a nice yard, and is four blocks from the public school. She had discussed with her present husband the fact that she desired to have her daughter with her and he was very much in favor of it. There are no children by the second marriage. She is not employed, does her own work, and could devote her time to taking care of her daughter, which she would do. "I waited to file this application until I felt I was in a position to properly care for my daughter. I would have filed it sooner had I been in a position to do so."

Mrs. Mabel Jones testified that Madelene has been with her practically all her life; that she is in school and attends school regularly; that she is making good grades and her grades have been above the average; that she has been engaged in other activities—school operettas; that she has been kept well dressed, and has been cared for and doctored when that was necessary; that she has nervous trouble, which the doctor has diagnosed as St. Vitus's dance; that "her limbs get so she can't stand on them and then her hands jump when she gets one of those nervous spells. She had a spell two weeks ago. She had not had one for better than two years. The little girl helps to wash and dry the dishes and little things like that. She is singing and laughing and is happy and seems to be a normal child." She testified she has love and affection for the child and the child's father has love and affection for the child and the child for the father. "When the mother visited the child at our home she did not say anything to disturb the child whatever. I have done nothing to prejudice the child against her mother. I would be willing for the mother to have her daughter, if her daughter would be happy with her." The husband of witness wants her to keep the child.

Mrs. Mabel Jones called several witnesses in opposition to plaintiff's application. A Mrs. Lucas testified:

"I have known Madelene Jones as her Sunday school teacher. She is a regular attendant of the Methodist church. She is well behaved. I have been in the grandmother's home and the little girl couldn't have better treatment."

Neither the little girl's father nor her grandmother attended church.

A Mrs. Kerr testified that she had known Mabel Jones since before she was married.

"I am acquainted with her home in Toronto. The grandmother has taught the child to behave and she has the reputation of being a well-behaved child. I think Mabel Jones is a fit and proper person to have the control of the child."

Flossie Bedigrew has lived in Toronto for seventeen years, is well acquainted with the little girl and the Joneses; has visited the Jones' home real often.

"The little girl receives the very best of care. I think Mrs. Jones, the grandmother, is a fit and proper person to have the care of the child. The child seems happy and contented and living a perfectly normal life."

The defendant, Manford Jones, testified that he is farming near Toronto; that he was married again in August, 1939, and has one child by that marriage.

"I have had the child out to my home just once during all the time she has been with her grandmother. . . . I go to town practically every night, after I get my chores done and see the girl. . . . I think it is to the best interests of the child to remain with her grandmother."

He further testified that plaintiff, when the child was quite young, told her that a big, bad wolf would carry her off if she was bad, and that the little girl was obsessed with the fear that someone was going to come and get her.

After hearing the evidence the court took the matter "under advisement for such period of time as would permit the child to finish out her school term." At some time—not clearly shown—the parties consented the court might visit the child in the grandmother's home. On June 10, 1941, the matter was taken up for decision, when the court found generally against the plaintiff, and further found:

". . . that the health and physical welfare of said child is in a precarious condition, and that it would be unwise and imperil the health of said child to change the care, custody and control of said child at this time, and that the welfare of said child would be best subserved by continuing the care, custody and control of the child in the grandmother's custody."

The application of the plaintiff was denied. Remarks of the court made at the time of this decision are brought to us by the counter abstract. In this the court criticized plaintiff for not doing more while she was living with the defendant, even though he was not making a home for her, and stated:

". . . but the foremost thing that has impressed the court is the fact that this little girl has apparently not any normal feeling for her mother. She is afraid of her mother. She is deathly afraid of her mother, and I don't think

that is due to any action on the part of the paternal grandmother or father. It just seems to be the natural thing, I suppose, because these grandparents have gone ahead and raised this child and assumed all the responsibility in connection with it."

He spoke of her nervous condition, but said: "It is something, however, I am satisfied that with the proper home environment she will outgrow." He spoke of the child being bright and of the good treatment she has received with her grandmother.

Reading this record one should not be criticized for concluding that on April 29, 1941, when the evidence was concluded, the court was of the opinion plaintiff's application for an order giving her the custody of the child should be granted; otherwise, why postpone announcing a decision to "permit the child to finish out her school term." We are forced also to conclude that, at some time, the court heard some facts, or supposed facts, not testified to by any witness. Courts, like jurors, should decide questions of fact upon the evidence produced in court. There is no evidence in the record tending to show that this little girl Madelene is afraid of her mother. Even the "big, bad wolf" story, as related by defendant, contains no intimation the telling of it caused the little girl to be afraid of her mother. Normally, a child frightened by a story of that kind would look to the mother for protection, yet the court, in the oral statement, placed the child's supposed "deathly fear" of her mother as the controlling thing. Clearly, this was error.

Appellant argues the finding of the court that the health of the "child is in a precarious condition" is not supported by the evidence. The point is well taken. The only evidence on this point was by the opponent of the application, that the little girl had spells of nervousness which a doctor at some time had diagnosed as St. Vitus's dance; but she had not had one of the spells for "more than two years" until about two weeks before the hearing, and there is no intimation in the evidence that was sufficiently severe to need medical treatment, or that a doctor was called. The testimony of Mabel Jones respecting her work in school, that "she is singing and laughing and is happy and seems to be a normal child," and of her witness, Flossie Bedigrew, "The child seems happy and contented and living a perfectly normal life," are in conflict with the court's finding on this point. The testimony of no witness supports it.

We note the fact that while appellant's former husband, Manford Jones, Jr., appears in the caption here as appellee, no one contends

the custody of the child should be given to him. The record shows his mother, Mrs. Mabel Jones, the child's grandmother, appeared in court with her counsel to oppose appellant's application to change the previous temporary order for the custody of the child, and she is the real appellee here.

At the time the divorce was granted the evidence in that action clearly disclosed that the defendant was not a suitable person to have the custody of the child; that plaintiff in that action—appellant here—was in fact found to be a suitable person to have the custody of the child, and there was no evidence to the contrary upon the hearing of this application respecting either of the parties.

It is firmly established by repeated decisions of this court that a parent who is able to care for a child and desires to do so, and who has not been found to be an unfit person to have the custody of the child, in an action or proceeding where that question is in issue and upon competent evidence, is entitled to the custody of the child as against grandparents or others who have no permanent legal right to the custody of the child, even though at the time they are giving the child suitable care and have acquired an attachment for the child. See: *Swarens v. Swarens,* 78 Kan. 682, 97 Pac. 968; *In re Hollinger,* 90 Kan. 77, 132 Pac. 1181; *Pinney v. Sulzen,* 91 Kan. 407, 137 Pac. 987; *In re Brown,* 98 Kan. 663, 159 Pac. 405; *In re Zeigler, Petitioner,* 103 Kan. 901, 176 Pac. 974; *Smith v. Scheuerman,* 133 Kan. 348, 299 Pac. 616; *Andrews v. Landon,* 134 Kan. 641, 7 P. 2d 91, and cases cited therein.

Counsel for appellee cite *In re Bort, Petitioner, etc.,* 25 Kan. 308, and *In re Bullen, Petitioner, etc.,* 28 Kan. 781, which deal with unusual situations, and cite, also, *Chapsky v. Wood,* 26 Kan. 650, and *Woodall v. Alexander,* 107 Kan. 632, 193 Pac. 185. These cases were not overlooked in the consideration of the later cases, above decided, and while some of them present unusual situations, there is nothing in them contrary to the general principle of law above stated.

Counsel for appellee call attenion to the fact that appellant is now living in California, and if given custody of the child would take her there, out of the jurisdiction of the trial court. In its statement at the time of denying appellant's application the court adverted to this fact, but apparently gave it but little weight. This was proper. If the father of the child had been found to be a suitable person, and had been given custody of the child and was properly exercising

the responsibilities thereby imposed, and appellant had asked for a change of custody, this point would have some force. As against the appellee here, it has none. In *In re Bullen, Petitioner,* supra, when Justice Brewer determined that the petitioner, who lived in London, was entitled to the custody of the child, he did not hesitate to order her sent there.

The record clearly shows appellee is a good woman, that she is attached to the child, and would give her good care, in sickness or health. Appellant freely so testified at each of the hearings, and there is no evidence to the contrary. But, as determined in many of the cases hereinbefore cited, those facts are not controlling; indeed, they are of no weight as against a parent who has not been adjudged to be an unfit person to have the custody of a child, when asserted by one who is not a parent. There is no reason to say this child will not have a good home and be well cared for by her mother.

From what has been said it necessarily follows the judgment of the trial court should be reversed with directions to grant the application of appellant. It is so ordered.

HOCH, J., not participating.