No. 36,964

In the Matter of LARRY EDGAR JACKSON, a Minor (MRS. MADGE McFALL, *Petitioner,* v. EDGAR JACKSON, *Respondent*).

(190 P. 2d 426)

Opinion filed March 6, 1948.

*Harry K. Allen* and *L. M. Ascough,* both of Topeka, argued the cause for the petitioner.

*Ed Rooney,* of Topeka, and *James S. Lester,* of Oskaloosa, argued the cause, and *Jacob A. Dickinson* and *David Prager,* both of Topeka, were on the briefs for the respondent.

The opinion of the court was delivered by

SMITH, J.: This is an original proceeding in habeas corpus. The facts are about as follows:

Mrs. McFall alleged that Larry Edgar Jackson was restrained of his liberty by the respondent, Edgar Jackson, and that she was entitled to his custody. She stated in her petition that Larry was born March 6, 1941, and that Edgar Jackson, who confined him at the time the petition was filed, was his father, and his mother, who died when Larry was five months old, was the sister of petitioner; that at the time of the death of Larry's mother respondent gave him into the care and custody of petitioner and relinquished all right to him; that she had paid the hospital and doctor bills at the time of the confinement of Larry's mother and during the months following the birth, and when his mother died paid all funeral expenses; that after Edgar Jackson, respondent, gave the child to the custody of petitioner he had never at any time assumed any responsibility in regard to his care and upbringing and never made any payment for his expenses; that on a certain day in April, 1947, respondent appeared at the home of petitioner and demanded custody of Larry, and upon the refusal of petitioner to give his custody to respondent took him by force and brought him to the home of respondent in Jefferson county.

A writ was issued and the respondent thereafter made a return, in which he alleged that he had Larry under his custody and the authority for such detention was that Larry was born March 6, 1941; that his mother had died August 24, 1941; that respondent was the natural father and surviving parent of Larry; that respondent never at any time had relinquished the claim to him; that he had at various times contributed to his support; that he requested custody of Larry from petitioner and it had been refused; that on January 28, 1947, he went to the home of petitioner in Colorado and obtained custody of Larry and returned to his home near Valley Falls; that Larry remained at his home until about February 24, 1947, when the petitioner and her husband requested that they be permitted to take him to the home of his maternal grandparents for a visit; that this request was granted and her husband took the child to their home in Colorado without the authority of respondent; that when respondent learned that Larry had been returned to Colorado he requested by mail his return to Kansas; that this request was not

complied with and on April 28, 1947, respondent went to the home of petitioner in Colorado and when he was refused Larry's custody took custody of him and returned him to his home near Valley Falls; that respondent was able to provide a comfortable home, the necessities of life, educational facilities, companionship of other children and a mother for Larry and he and his wife were proper persons to have his custody; that at the time respondent permitted petitioner to take his custody he did not have proper domestic facilities for caring for a child of tender age, and it was proper for him to permit his wife's sister to have such custody until he could provide proper care for him. The respondent denied that he had a violent temper or that he ever struck or abused his first wife and denied he took Larry by force and violence from petitioner, and also denied that he neglected him and alleged that he had a natural paternal affection for Larry and was entitled to his permanent custody. Respondent prayed for an order denying the petitioner and for an order awarding the custody of Larry to him.

We appointed a commissioner to take evidence and make findings of fact and conclusions of law. The commissioner made a report as follows:

"1. Nellie McAffee and Edgar Jackson, both residents of Jefferson County, Kansas, were married April 27, 1931.

"2. Larry Edgar Jackson, their first child, was born March 6, 1941. The birth was by a Caesarian operation and the mother never fully recovered.

"3. The mother, Nellie, died in Bethany Hospital, Kansas City, Kansas, August 24, 1941; however, before she died she requested that her baby, Larry Edgar, be raised by her sister, Mrs. Madge McFall. The father, Edgar Jackson, was present at the time and agreed to this arrangement.

"4. The father, Edgar Jackson, after the death of his wife, told Mrs. McFall she could have Larry Edgar and that he would not interfere and also told others it was a God's blessing that he had someone to raise the child.

"5. That at the time of the death of his wife, Edgar Jackson was an employee of Fred McLeod and in debt $5,000.00.

"6. Mrs. Madge McFall, at the time of her sister's death, resided in Kansas City, Kansas. In 1943, she and her family moved to a ranch 4 or 5 miles from Woodrow, Colorado.

"7. Edgar married his present wife 4 years ago last October and has a stepson whose father is dead, age 9, and a baby girl born about 7 months ago.

"8. Edgar Jackson now owns 380 acres and a half interest in an additional 355 acres and owes $3,000.00. He is net worth in excess of $15,000.00.

"9. The home of Mrs. Madge McFall is a good Christian home and a proper place to raise children. She has given Larry Edgar the proper kind of training and attention during the time he was in her home.

"10. That the father, Edgar Jackson, has contributed very little toward the support of the child, Larry Edgar; however, the McFalls did not request any assistance from him nor did they want any.

"11. That Edgar Jackson has a nice home now and bears a good reputation in the neighborhood in which he resides.

"12. That no adoption proceedings have been instituted by the McFalls.

"13. That the father, Edgar Jackson, in January, 1947, brought the child Larry to Kansas for what Mr. McFall thought was a visit and on February 19, 1947, wrote to Mrs. McFall that he was going to keep the child.

"14. That the McFalls came to Kansas and on or about February 24, 1947, went to the Jackson home for lunch. In the afternoon on the pretext they were taking Larry to visit his grandmother, they took him away with them and took him back to their home in Colorado, without informing his father.

"15. That on the morning of April 28, 1947, Edgar Jackson and his brother arrived at the McFall ranch and forcibly took the child, Larry, and brought him back to the Jackson home in Jefferson County, Kansas. The child now is at the home of the father.

"CONCLUSIONS OF LAW

"1. Edgar Jackson, the father of Larry Edgar Jackson and the natural guardian, has not surrendered his rights to the custody of said minor child in the manner provided by law and has not legally renounced his rights to the custody of such child.

"2. That the respondent, Edgar Jackson, has not forfeited his rights to the custody of said child because of his personal unfitness.

"3. That the respondent, Edgar Jackson, is financially able to support said minor child in a proper manner.

"4. Under the facts as found, the court has not discretion in the matter of decreeing that Edgar Jackson should have the custody of the said minor child.

"5. That the petition for a Writ of Habeas Corpus be denied.

"6. That the respondent, Edgar Jackson, have the custody of his minor son, Larry Edgar Jackson, and that Edgar Jackson be required to pay all costs herein."

Petitioner filed a motion to set aside these findings and conclusions of law because they were contrary to the evidence and the law. The petitioner points out here first that the findings of fact of the commissioner are advisory only. That is the correct rule. (See *State, ex rel., v. Sage Stores Co.*, 157 Kan. 404, 141 P. 2d 655.) He then points out that the commissioner found the child Larry was in the legal care and custody of petitioner and that respondent forcibly took him and brought him back to Kansas. The record does not quite sustain that assertion. It is true the commissioner found that Larry's mother before she died requested that he be raised by her sister, the petitioner. The commissioner also found that respondent, the father, Edgar Jackson, was present at that time

and agreed to this arrangement. The findings of the commissioner, however, as to what happened later do not quite bear out the assertion that at the time respondent took Larry into his possession he was lawfully in the custody of petitioner. The record is susceptible to the interpretation that the petitioner and her husband got Larry into their custody by a ruse and surreptitiously took him back to Colorado.

The petitioner argues, however, that by taking Larry into his possession forcibly the respondent did not acquire any right to his custody. To sustain this proposition she cites and relies on a case where we held that one whose cattle are in possession of another does not have the right to take them by force or violence or by a breach of the peace. There is a quotation from Blackstone to the same effect. Indeed counsel for petitioner argues had the attempt been made in Kansas respondent would have been guilty of kidnapping in the second degree, in violation of G. S. 1935, 21-450.

Counsel then refers to some evidence in the record to the effect that a year before the birth of Larry respondent had committed an assault and beat upon Larry's mother and beat her until she was black and blue. From this bit of evidence the petitioner argues that respondent is unfit to have the custody of the child. Then follows a number of citations in which we have held in a habeas corpus action where a father had custody of a daughter, there was evidence which proved that her interest would be best promoted by removing her to the custody of those who had reared her.

These decisions are all to the effect that in a proceeding of this kind we look through legal technicalities and, regardless of the feelings of the adult in the case, do what we think is for the best interest of the child. Running through all those decisions, however, is the rule that unless the natural parent is found to be an unfit person the custody of the child would be given to the natural parent. The findings of fact in this case are to the effect that the father now has remarried, has a substantial fortune, has a nice home and bears a good reputation in the neighborhood. This certainly falls far short of a finding that he is not a fit person for Larry's custody.

An early case involving child custody is *Chapsky v. Wood*, 26 Kan. 650. There this court finally gave custody of a little girl to the aunt who had raised her from babyhood. We left no doubt, however, that the natural parents were prima facie entitled to the custody but such must yield to the court's judgment as to what was

for the best interests of the child. The opinion states the rules and the underlying reasons for them so well and clearly that much of it will be incorporated herein. We said:

"The questions of law which are involved in a case like this are few in number, and, I think, not subject to much doubt. They may be summed up briefly thus: The father is the natural guardian and is prima facie entitled to the custody of his minor child. This right springs from two sources: one is, that he who brings a child, a helpless being, into life, ought to take care of that child until it is able to take care of itself; and because of this obligation to take care of and support this helpless being arises a reciprocal right to the custody and care of the offspring whom he must support; and the other reason is, that it is a law of nature that the affection which springs from such a relation as that is stronger and more potent than any which springs from any other human relation.

"The second proposition of law is, that a child is not in any sense like a horse or any other chattel, subject-matter for absolute and irrevocable gift or contract. The father cannot, by merely giving away his child, release himself from the obligation to support it, nor be deprived of the right to its custody. In this it differs from the gift of any article which is only property. If to-day Morris Chapsky should give a horse to another party, that gift is for all time irrevocable, and the property can never be reclaimed; but he cannot by simply giving away his child relieve himself from the obligation to support that child, nor deprive himself of the right to its custody.

"I might say here, that the statute has provided for a relinquishment through probate court proceedings, which may be considered (but that is outside this case) irrevocable.

"The third proposition is, that a parent's right to the custody of a child is not like the right of property, an absolute and uncontrollable right. If it were, it would end this case and relieve us from all future difficulties. A mere right of property may be asserted by any man, no matter how bad, immoral, or unworthy he may be; but no case can be found in which the courts have given to the father who was a drunkard and a man of gross immoralities, the custody of a minor child, especially when that child is a girl. The fact that in such cases the courts have always refused the father the custody of his child, shows that he has not an absolute and uncontrollable right thereto.

"The fourth proposition is, that though the gift of the child be revocable, yet when the gift has been once made and the child has been left for years in the care and custody of others, who have discharged all the obligations of support and care which naturally rest upon the parent, then, whether the courts will enforce the father's right to the custody of the child, will depend mainly upon the question of whether such custody will promote the welfare and interest of such child. This distinction must be recognized. If, immediately after the gift, reclamation is sought, and the father is not what may be called an unfit person by reason of immorality, etc., the courts will pay little attention to any mere speculation as to the probability of benefit to the child by leaving or returning it. In other words, they will consider that the law of nature, which declares the strength of a father's love, is more to be con-

sidered than any mere speculation whatever as to the advantages which possible wealth and social position might otherwise bestow. But, on the other hand, when reclamation is not sought until a lapse of years, when new ties have been formed and a certain current given to the child's life and thought, much attention should be paid to the probabilities of a benefit to the child from the change. It is an obvious fact, that ties of blood weaken, and ties of companionship strengthen, by lapse of time; and the prosperity and welfare of the child depend on the number and strength of these ties, as well as on the ability to do all which the promptings of these ties compel.

"The fifth proposition is, that in questions of this kind three interests should be considered: The right of the father must be considered; the right of the one who has filled the parental place for years should be considered. Perhaps it may not be technically correct to speak of that as a right; and yet, they who have for years filled the place of the parent, have discharged all the obligations of care and support, and especially when they have discharged these duties during those years of infancy when the burden is especially heavy, when the labor and care are of a kind whose value cannot be expressed in money— when all these labors have been performed and the child has bloomed into bright and happy girlhood, it is but fair and proper that their previous faithfulness, and the interest and affection which these labors have created in them, should be respected. Above all things, the paramount consideration is, what will promote the welfare of the child? These, I think, are about all the rules of law applicable to a case of this kind." (pp. 652-654.)

The opinion reads as if the learned justices had actually had the little girl and the other parties before them. Perhaps they did do so in 1881. At any rate, Justice Brewer, in speaking of the father of the child, the petitioner, said:

"He seems to us like a man still and cold and a warm-hearted child would shrink and wither under care of such a nature, rather than ripen and develop."

Then, too, the courts seemed impressed by the fact that should custody of the child be given to the father she would always be under the cloud of coming from one who was not a favorite in the family. This last observation sprang from the fact that the father's family had never been reconciled to the marriage of the girl's father and mother. Be that as it may, the opinion is sound authority for the rule—first, that the natural parent is prima facie entitled to the custody of his child; second, that a parent cannot by giving a child away avoid the duty to support it or forfeit the right to its custody; and third, this right is not an absolute one; and fourth, and fifth, the welfare of the child is ever and always the paramount issue. Thirty-three years later, in 1914, we decided *Wood v. Shaw*, 92 Kan. 70, 139 Pac. 1165. There the father had delivered a son, two years old, and a baby girl, four days old, to the custody of their grand-

parents, the parents of the children's mother. By a written contract the father agreed they might remain with their grandparents for fourteen years. Four years later he remarried and endeavored several times to secure the children from their grandparents but was not successful. He brought habeas corpus to get their custody. There had been some trouble between the father and the grandparents and on one occasion he had gained possession of the children by a ruse. This was all pointed out in our opinion. We said:

"The agreement referred to is not controlling, because the custody of the children is not a matter to be determined by contract. (*Chapsky v. Wood*, 26 Kan. 650; Notes, 27 L. R. A. 56, 41 L. R. A., n. s., 578, 42 L. R. A., n. s., 1013.) There is no substantial controversy as to the important facts of the case. The court is of the opinion that there is nothing in the circumstances of the case to overcome the natural claim of the father to the custody of his children, inasmuch as his right is not subject to be contracted away, and has not been forfeited by any misconduct; that the present arrangement affords no such superior advantage to the children as to offset this consideration, especially in view of the fact that after seven years more they were in any event to be returned to him." (p. 72.)

*In re Kailer*, 123 Kan. 229, 255 Pac. 41, was a habeas corpus case where a father sought to regain custody of his two children whom he had intrusted to his brother and sister-in-law at the death of their mother. The petition was filed in district court and the court found that the uncle and aunt had agreed to rear the children as their own on the condition that the father would not ask for them as long as the uncle and aunt should live. The court also found that the children were being well cared for by the uncle and aunt. This court allowed the writ, however, and said:

"Putting the matter in another way, it is quite correct to say that the welfare of children is always a matter of paramount concern, but the policy of the state proceeds on the theory that their welfare can best be attained by leaving them in the custody of their parents and seeing to it that the parents' right thereto is not infringed upon or denied. This is the law of the land on this subject. And it never becomes a judicial question as to what is for the welfare and best interests of children until the exceptional case arises where the parents are dead, or where they are unfit to be intrusted with the custody and rearing of their children and have forfeited this right because of breach of parental duty, or where the right has been prejudiced by the discord of the parents themselves."

Again we said:

"Touching the oral agreement between the litigants at the time the children were taken charge of by respondents, it hardly needs to be observed that babies are not property to be disposed of by parol contract. We note the in-

dustry of appellants' counsel who have found decisions and precedents at variance with this view of the law, but it is all familiar and settled doctrine in this jurisdiction. (*Swarens v. Swarens,* 78 Kan. 682, 97 Pac. 968; *In re Hollinger,* 90 Kan. 77, 132 Pac. 1181; *Pinney v. Sulzen,* 91 Kan. 407, 137 Pac. 987; *Buchanan v. Buchanan,* 93 Kan. 613, 144 Pac. 840; *In re Meyer, Petitioner,* 103 Kan. 671, 175 Pac. 975; *In re Zeigler, Petitioner,* 103 Kan. 901, 176 Pac. 974; *Crews v. Sheldon,* 106 Kan. 438, 186 Pac. 498; *Denton v. James,* 107 Kan. 729, 193 Pac. 307; *Jendell v. Dupree,* 108 Kan. 460, 464, 195 Pac. 861. See, also, *Whitaker v. Coffman,* 112 Kan. 594, 598, 211 Pac. 1116; 212 Pac. 912.)" (p. 231.)

(See, also, *Wood v. Lee,* 123 Kan. 669, 256 Pac. 797; *Tucker v. Finnigan,* 139 Kan. 496, 32 P. 2d 211; *Melroy v. Keiser,* 123 Kan. 513, 255 Pac. 978; *In re Windell,* 152 Kan. 776, 107 P. 2d 708; *Wilson v. Kansas Children's Home,* 159 Kan. 325, 154 P. 2d 137; and *Andrews v. Landon,* 134 Kan. 641, 7 P. 2d 91.)

What is for the best interests of this child? In answering such a question judges feel their inadequacy. Obviously courts cannot go about changing the custody of children arbitrarily. There is at the outset one settled factor. The divine plan for keeping the human race on the earth provides that every living person have two parents. Courts did not provide that. It was here before courts were. Because two people unite in bringing a person into the world they assume certain obligations toward this new arrival and from the start they have certain rights over him. That is the way it is. People are not perfect. Sometimes they do not meet their obligation. For such occasions we have juvenile courts where upon proper showing parents may be deprived of the custody of their children. Then we have cases where children having been brought into the world, the parents simply cannot carry the burden of caring for them, perhaps one parent has died, or perhaps both of them. For such cases we have evolved the method of adoption, perhaps one of the sweetest relationships known to man. We have deemed it wise, however, to surround the business of adoption with certain formalities that must be observed. Occasionally two people after having started a home and having brought children into the world find themselves unable to continue the relationship. The result, a divorce suit and a court dealing with the custody of the children. Then we have cases such as this. A young mother lies dying. On her deathbed her only thought is of the life she has just brought into the world. The drama has been reënacted many times in our reports. The dying mother asks that her baby be given to her sister. Natur-

ally the brokenhearted father consents. And at first all goes well. Time is a great healer, however. The young father is a normal person. He remarries. There is nothing about this to lessen his respect for his dead first wife. The same thing is done thousands of times every year. Perhaps that is the way it should be. Every normal man should have a home. Once in a home of his own, however, he begins to think about the tiny baby he was forced by circumstances to turn over to the baby's aunt or grandmother. Here is where the heartache starts. The person who has tended to that baby since it was tiny and has perhaps guided its first faltering footsteps has grown to love it as her own. That is the most lovable trait of human beings. We love those dependent on us. Anyway, the young father demands, the aunt refuses. Sometimes there are ruses, surreptitious taking or forcible taking. Eventually the matter finds its way to court. Then this court, all the members of which are fathers, some grandfathers, have to do is form the pattern of life for that child. The first consideration is the well-being of the child. That precept springs from the fact that this is a christian country. But are there no other criteria? If there were none the task would be well-nigh unsurmountable. There is one other criterion, however. If one of the parties is a parent that person has a prima facie right and obligation to the custody. Here we are right back to where we started. The person responsible for bringing this life into the world must be responsible for its well being. There is one consideration which will prevent this rule from operating. We find it in cases of this type, in divorce cases, and in juvenile court cases. Is the parent an unfit person to have this custody? Bear in mind the presumption is that he is fit. The commissioner found here facts from which he and we are warranted in concluding that he was a fit person to have this custody. The petitioner argues that testimony as to an isolated case of misconduct toward this child's mother a year before he was born, together with the violence with which he obtained custody of Larry in Colorado require a finding that he was not fit. As to the charge of misconduct, that was disputed by the respondent from the witness stand. The commissioner saw all the witnesses on the stand and heard them testify. He had a better opportunity than we to form a judgment as to whether the acts charged actually took place. While the findings of a commission are advisory only we do not overturn them unless some good reason appears from the entire record. In the condition of this rec-

ord we do not feel we should reach a different conclusion as to the facts than was reached by the commissioner. Besides the incident happened several years ago. We are more concerned with the present and the future as to this child than with the past. The incident, if it happened, was not such as would compel us to hold that respondent is not a fit person to have custody of his child. As to the violence with which respondent took possession of the boy, that sort of conduct is regrettable. It, like all violence or force, often leads to far more violence and force than was contemplated at the outset. Such is the ever present cause of criminal acts. Respondent would better have resorted to the courts of Colorado to gain possession of his son. On the other hand, petitioner had gained possession of him by trickery and a ruse. This does not excuse, but does tend to explain the act of respondent in getting possession of his son in the way he did. We do not regard such conduct of sufficient reprehensibility, however, as to indicate such a violent temper as to require a conclusion that respondent is not now a fit person to have custody of this child.

The writ is denied.