No. 37,441

Velma Faye Stout, E. M. Ruddick and Mrs. E. M. Ruddick, *Appellees*, v. William Mace Stout, *Appellant*.

(201 P. 2d 637)

Opinion filed January 22, 1949.

*Edward Wahl,* of Lyons, argued the cause, and was on the briefs for the appellant.

*Frederick Woleslagel,* of Lyons, argued the cause, and *J. Paul Stevenson, T. Gra Gaston* and *Granville M. Bush,* all of Lyons, were with him on the briefs for the appellees.

The opinion of the court was delivered by

Parker, J.: This appeal arises from a judgment of the district court refusing to change an order made in a divorce action awarding the custody of two minor children to their mother.

· A detailed statement of the facts upon which such order is based is essential to the issues presented on appellate review.

On the 6th day of May, 1940, William Mace Stout and Velma Faye Stout were husband and wife and the natural parents of twin daughters, Darlene Sue Stout and Dixie Lou Stout, who were then about twelve months old. Due to marital differences the wife filed an action for a divorce against her husband on such date and he entered his voluntary appearance therein. In due time she obtained the divorce, without contest, and was awarded custody of the two minor children.

Early in the year of 1948 the father filed an application in the original action wherein he prayed for a change in the custody order and that he be given full care, custody and control of his children. Notice of the application was served upon his former wife and upon her parents with whom the two children were and had been living. Thereafter all parties appeared before the court for a hearing on the application. In lieu of an answer the mother and the grandparents orally stated their position to be the sole issue involved on the hearing was whether the father or the maternal grandparents should have the custody of the children. With issues thus drawn trial of the cause proceeded.

We are more concerned with what was presented to the court at the hearing than anything else and for that reason have purposely refrained from detailing allegations of the application or sketching the history of events transpiring during the years intervening between its date and the day of the rendition of the original custody decree.

The material facts to be gleaned from all the evidence adduced by interested parties are not in serious conflict and can be summarized as follows:

1. From the time she was given custody of her children under the original order the mother left them with her parents and so far as the record shows had little to do with their supervision and control. In support of her position regarding what order should be made by the court with respect to their custody she testified in effect that she did not think either she or her ex-husband should have them and that she contended the best thing for them was to be with her father and mother where they would be better off and where they had been for the last nine and one-half years. Consistent with her theory and contention on this point no testimony was offered in her behalf or that of her parents in regard to her circumstances or her ability to take over their actual care and custody. The record

does, however, disclose that she had remarried and was maintaining another home away and apart from her two girls and nowhere is there anything to be found therein which indicates she was willing to assume the obligations incident to their care and supervision or actual custody.

2. About the time of the rendition of the decree in the divorce action William Mace Stout left the state and lived in Iowa for a time. Later he returned to Kansas and in September, 1941, remarried. On January 1, 1942, he entered the armed forces of the United States and served for three and one-half years, where his record, so far as bravery was concerned, was above the average. After being discharged from the army he returned to Sterling, Kan., where he obtained employment and together with his wife established a modern home, sufficient to accommodate the presence of his two daughters, in which he and his wife were living on the date of the filing of the involved application. The record reveals that she was a woman of estimable character and that in testifying at the hearing on behalf of her husband she stated she had never been married before and had no children but had much experience in caring for other peoples' children, expressed affection and fondness for Darlene Sue and Dixie Lou and indicated a willingness to make them a home and give them the love and affection of a mother. The father likewise stated that he was in a position to give his children a good home, should the court grant him their custody, and that he desired to do so.

3. The maternal grandparents Mr. and Mrs. E. M. Ruddick were sixty-eight and sixty-three years old, respectively, on the date of the hearing, and at that time had had actual care and custody of the two girls for at least eight years and perhaps longer. They are conceded to be people of high standing and character, financially able to support two children, and there can be no doubt but that during all such period of time, they not only gave their two grandchildren proper care and support and the benefits of a good home but bestowed upon them all the love and affection of fond and doting grandparents.

4. After the divorce decree and at least until after the time William Mace Stout returned to Sterling and established his present home he did not evidence or display any particular interest in or affection for his two children. If he inquired about their welfare at all he did so infrequently. He made no effort to give them finan-

cial aid or assistance. The most that can be said for his efforts in that respect until he entered the service is that he sent them a few presents from time to time of inconsequential value. Upon becoming a member of the armed forces he made an application for a family allowance, listing his two minor children as living with his second wife. This application was approved and while there is some controversy as to whether his two children received the entire amount of the allotment during all of the time he was in the army it is clear that they did do so from the latter part of 1943 until the date of his discharge. A fair summarization of the evidence on the specific point treated in this paragraph is that it was not until his return from the army that Mr. Stout evidenced the usual and ordinary interest of a parent in his children and that even then he made no attempt to make financial contributions compensating their grandparents for expenses necessarily incurred in supporting them.

With evidence of the character heretofore related before it the trial court in a written decision denied the father's application and refused to change the original custody order. Portions of such order essential to disposition of the appeal read:

"The court is not, at this time, going to change the original order granting the care, control, and custody of these minor children to the mother, for the reason that there was nothing to show that the mother was an improper person to have such care, control, and custody, and while there was nothing introduced to show that the father was an improper person, still the record has been that he has never contributed too much, or taken too much of an interest in these children, and in the opinion of the court has not given, and does not have the love and affection toward these children, and the welfare of these children as much at heart, as a parent ordinarily would have and feel toward two children like these."

Following rendition of the foregoing judgment and the overruling of a motion for new trial the father perfected this appeal, serving notice not only on the mother but upon both Mr. and Mrs. Ruddick who were the real defendants in the proceeding below and hence necessary parties on appellate review.

When carefully analyzed the fundamental questions raised by appellant's specification of errors are that in the light of the uncontroverted evidence and the conceded theory on which the cause was tried by the parties the trial court (1) abused its discretion in refusing to change the original order and decreeing that custody of the children should remain in the mother, and (2) in denying the father's application and refusing to award him their custody.

We simply hold that in a child custody proceeding, instituted by a father to obtain the custody of children awarded to their mother by an order made some eight years before, where the mother concedes she does not desire or seek custody of her children, who, under the undisputed evidence have been in the actual custody of her parents from the date she obtained the initial order and when all interested parties contend and repeatedly assert the sole issue is whether the father or the maternal grandparents are entitled to their custody, the district court abused its sound judicial discretion in refusing to change the original order and in adjudging that the sole and complete care, custody and control, of the children be left with the mother. The effect of its order was to merely continue custody in the grandparents.

Thus we come to the next question which, under the record, clearly appears to have been submitted to and given consideration by the court in reaching its judgment. Was the father entitled to custody of his children as against the grandparents? If this court is to adhere to the doctrine of *stare decisis* there can be but one answer to the question under our decisions. We note and for emphasis point to that portion of the findings which read: "there was nothing introduced to show that the father was an improper person." Under our recent and often repeated decisions, to which we have strictly adhered for many years, the established and inviolate rule has been and now is that a parent who is able to care for his children and desires to do so, and who has not been found to be an unfit person to have their custody, in an action or proceeding where that question is in issue, is entitled to the custody of his children as against grandparents or others who have no permanent or legal right to their custody, even though at the time the natural parent seeks their custody such grandparents or others are giving the children proper and suitable care and have acquired an attachment for them (See *Jones v. Jones,* 155 Kan. 213, 219, 124 P. 2d 457; *May v. May,* 162 Kan. 425, 176 P. 2d 533; *In re Jackson,* 164 Kan. 391, 190 P. 2d 426; *Bailey v. Bailey,* 164 Kan. 653, 192 P. 2d 190, citing numerous other and early decisions to the same effect).

We frankly concede that on rare occasions the rule just stated leads to consequences which sometimes appear to be harsh and do not correspond with our sympathies under the exigencies of a given case. Even so we are convinced that to change it would lead to more frequent results of that character. Be that as it may, the

doctrine is now too firmly entrenched in the settled law of this state to permit its repudiation and we are constrained to adhere to it.

The reasons for the doctrine and the philosophy behind its enunciation are set forth and well stated in *In re Kailer*, 123 Kan. 229, 255 Pac. 41, likewise holding that a natural parent is entitled to the custody of his children where he has not forfeited the right to be intrusted therewith because of personal unfitness. In the opinion of such case Justice Dawson, later chief justice of this court, said:

"Noting respondents' objection to this judgment, it is urged that the welfare and best interests of the children were the paramount issue. Under the law of the land the welfare and best interests of children are primarily the concern of their parents, and it is only when parents are unfit to have the custody, rearing and education of children, that the state as *parens patriae*, with its courts and judges, steps in to find fitting custodians *in loco parentium*.

"Casuists could make a good argument that in the legendary case of the old woman who lived in a shoe, who had so many children she did not know what to do, the welfare and best interests of those children would be to rescue them from the scant regimen and Solomonic discipline of the worthy dame who had brought them into the world, and to place them in homes of well-to-do, kindly foster parents; but so long as the old woman did her duty by her numerous progeny according to her ability, no court would have the right to displace her as their natural and lawful custodian.

"Putting the matter in another way, it is quite correct to say that the welfare of children is always a matter of paramount concern, but the policy of the state proceeds on the theory that their welfare can best be attained by leaving them in the custody of their parents and seeing to it that the parents' right thereto is not infringed upon or denied. This is the law of the land on this subject. And it never becomes a *judicial* question as to what is for the welfare and best interests of children until the exceptional case arises where the parents are dead, or where they are unfit to be intrusted with the custody and rearing of their children and have forfeited this right because of breach of parental duty, or where the right has been prejudiced by the discord of the parents themselves. There are enough of the latter sort of cases where the courts are compelled to interfere and take the custody of children from unfit parents, or to decide which of quarreling parents should have that custody—cases which search the hearts and consciences of judges as no other judicial duty does or can do. And no court should construe its intrusive jurisdiction as extending to cases where parents have done nothing offensive to law, morals, or good conduct, which would forfeit their paramount natural right of parenthood, which is to have the custody of their own children." (p. 230.)

In their brief appellee cite several decisions wherein there is some language emphasizing that the welfare of children is the paramount issue in a custody proceeding and which, perhaps, justifies the inference that in a contest between a natural parent and grandparents or others who have no permanent legal right to their custody, the

district court may give the children of such parent to third persons notwithstanding it has failed to find that he is an unfit person to have their custody. It is not necessary that we refer to such cases or attempt to harmonize them with those to which we have heretofore referred. It will suffice to say that if there is any language to be found in any of our decisions justifying the construction that the children of a natural parent may be given to third persons without a finding such parent is an unfit person to have their custody it should be and is hereby disapproved.

Appellees rely heavily on *In re Jackson,* supra, an original proceeding in habeas corpus, as supporting their position. It is true that in that case we quote at length from *Chapsky v. Wood,* 26 Kan. 650, the opinion of which contains some language of the kind just mentioned. It is also true, that in the opinion of the Jackson case we inquired as to what was for the best interests of the child there involved and stated that its well-being was our first consideration. Notwithstanding, it is interesting to note, we also recognize and reaffirm the doctrine which has here been under consideration and hold that since there was no evidence to justify us in finding the respondent was not then a fit person to have custody of his child, we were required to deny the writ and award the custody of the child to the father even though he had taken it by stealth from the home of the sister of his deceased wife to whom its custody had been intrusted by his wife on her deathbed with his assent and approval.

A final argument advanced in support of the judgment is that the last sixty-seven words of the district court's decision, heretofore quoted, amounted to a finding of unfitness on the part of the father. Without laboring the point it can be said we are convinced they cannot be given that force and effect.

The judgment is reversed and set aside and the cause remanded with directions to render judgment in favor of the father, awarding him the care and custody of his twin daughters.

SMÎTH, J. (dissenting): I find myself unable to agree with the opinion of the majority. This is a motion to modify the original judgment in a divorce action in which judgment the custody of the twins was awarded the mother. There the custody has remained for about nine years.

As a ground for this modification, the father alleged in his motion that the mother had abandoned this custody to her mother and

father. The father does not charge that the twins have been mistreated or that they are neglected or abandoned. All the evidence is that the grandparents have done a good job rearing the twins thus far.

In such a case as this we have said the trial court had continuing jurisdiction of the custody of minor children. We have said many times that the trial court had a broad discretion as to custody. We have said in many cases the welfare of the children was the paramount issue, that is, neither parent has a vested interest in the custody of a child when the home is broken up, when such custody would not be for the benefit or would not advance the welfare of the child.

I do not think courts are as helpless to safeguard a child's welfare as this opinion might indicate.

Here the learned trial judge had all the parties before him. He even had an interview with the twins. They are old enough so that he would be able to form an opinion from that interview and all the other evidence as to whether they had been well reared thus far.

Since the welfare of the twins is the paramount issue and since the trial judge in the exercise of his discretion saw fit not to modify the original judgment as to custody, I would prefer not to disturb that action.