Tᴀᴍᴍʏ Gᴀɪʟ Tʀᴏᴍᴘᴇᴛᴇʀ, *Appellant*, v. Lᴇᴏ Eᴜɢᴇɴᴇ Tʀᴏᴍᴘᴇᴛᴇʀ, *Appellee*.

(545 P. 2d 297)

Opinion filed January 24, 1975.

*Thomas R. Oglevie,* of Oglevie and Warren, Chartered, of Goodland, and *Perry Warren,* of the same firm, argued the cause, and were on the brief for the appellant.

*Charles A. Sparks, Jr.,* of Sparks & Foust, of Goodland, argued the cause and was on the brief for the appellee.

The opinion of the court was delivered by

SCHROEDER, J.: This is an appeal by Tammy Gail Trompeter (plaintiff-appellant) from the trial court's denial of her motion for change of custody of her seven year old daughter, Cynthia. The appellant, who was not found to be an unfit person to have custody of Cynthia, attacks the trial court's decree which continued "custody" to Cynthia's father (Tammy's ex-husband), the appellee herein, because Cynthia "resided with" a third party.

At issue on appeal is the meaning of the term "custody."

Tammy Gail Trompeter and the appellee, Leo Eugene Trompeter, were divorced in Sherman County on May 5, 1970. Custody of their one child, Cynthia Gwyn Trompeter, was temporarily given to Tammy. After receiving a State Welfare Department report, the Sherman County District Court determined, on March 4, 1971, that the best interest of Cynthia would be served by changing her custody from Tammy to Leo Trompeter, "with said child to reside with Mr. and Mrs. Joy Kitchen of Ruleton, Kansas." Since the order of March 4, 1971, Cynthia has continually resided with Mr. and Mrs. Kitchen who are not related to either party in this dispute.

Since April of 1971, both the appellee and the appellant have remarried. The appellee remarried in November 1972, and now resides in Brewster, Kansas. He lives close to town in a four bedroom house he recently purchased. He is engaged in farming and cattle ranching.

The appellant remarried and is now known as Tammy Winebaugh. She resides in Paramount, California. She has one child by her present marriage. Her new husband, a welder, makes a good living. Their apartment has plenty of room for Cynthia. The

appellant recently had surgery which prevents her from bearing any more children.

On April 20, 1974, the appellant commenced this action requesting custody of Cynthia on the grounds that circumstances surrounding the child and the parties had materially changed. She contended her California home is a proper place to raise a child. Jeanette Glazier, a State Department of Social and Rehabilitation Services social worker, testified concerning a home study done of the Winebaugh home in California. Based on this home study, she could not say the appellant was an unfit person to have custody of Cynthia. The trial court concluded the mother would probably provide an average, or close to average, home for the child.

The appellee was opposed to Cynthia going to California and has resisted the appellant's motion. The appellee testified that he was familiar with Cynthia's activities; that he talked quite regularly about her care with the Kitchens; and that he visited Cynthia an average of two or three times a month. Mr. Kitchen placed the visits at an average of once every month, but indicated the Kitchens sought the guidance and advice of the appellee with respect to Cynthia. The appellee's testimony regarding his advice established the degree of care and control he exercised as follows:

"Q. Do you have occasion from time to time to talk with the Kitchens about the care of Cynthia?

"A. I do. I talk to them quite regularly about the care of her and how she's playing, and the different things or arrangements that have to be worked out. I keep in contact all the time.

"Q. Are you familiar with the activities that Cynthia has been engaged in?

"A. I sure am."

The appellee then went on in some detail to discuss Cynthia's gymnastic and religious activities.

When the appellee was asked why he hadn't sought custody of Cynthia after his remarriage, the appellee testified he would love to have the child, but he felt she was better where she was because the Kitchens offered Cynthia a stable environment. The appellee's new wife, Bonnie Trompeter, corroborated the appellee's testimony. She went so far as to say that she wanted Cynthia from the first minute, but didn't have the heart to uproot her. The appellee did indicate he intends to keep a review of the situation so that at a future date as Cynthia grows older and gains an understanding, she could move into the Trompeters' recently purchased home.

The evidence of all the parties agreed the Kitchens provided

Cynthia with an excellent home. The appellee, his wife, the Kitchens, and the social worker who reviewed the situation all indicated that moving Cynthia at this point in her life would be emotionally upsetting. The social worker even indicated a change of custody at this time "would cause some great emotional adjustment and would require quite a little bit of assistance in counseling, perhaps, to help her adjust to any new situation that she was placed in." The social worker, therefore, recommended that Cynthia remain in the custody of her father residing with the Kitchens.

The appellee does not contribute any financial support to Cynthia, but he testified that he had offered money to the Kitchens for Cynthia's care but that they refused it.

The trial court recognized it was required to give custody to one parent instead of a third party absent a showing of parental unfitness. But the court held Cynthia was in the "custody" of the appellee. It determined:

". . . [T]he best interest of the minor child of the parties, Cynthia Gwen Trompeter, would be best served by her custody remaining in the Defendant, Leo Eugene Trompeter, with said child to reside with Mr. and Mrs. Joy Kitchen of Ruleton, Kansas, and with the Plaintiff to have reasonable rights of visitation, as previously ordered by the Court on the 4th day of March, 1971."

The trial court's feelings are best stated in its findings:

". . . [T]here is not one iota of evidence that this child is not in an excellent situation in every way, shape or form. So, despite the mother's desire to have the child in her home, and I'm satisfied now that she probably would make an average home, or close to average, for the child, this child is in beautiful shape now, and I'm not going to change the custody. Custody will remain as it is."

On appeal the appellant contends since there was no finding that she is an unfit person to have custody, she is entitled to have custody as against the Kitchens, who have no right to legal custody, but who as a practical matter, have been given custody by Cynthia's father. She further contends the ostensible granting of Cynthia to the appellee is no more than a sham when he has turned over the supervision, direction, control and care of Cynthia to the Kitchens.

The appellee contends he has retained decision-making authority over Cynthia's care, control, education, health and religion. He argues the sum total of his activities amount to "custody." He further argues "custody" and "residing with" are not synonymous; that it is within the sound discretion of the trial court to make an order respecting custody where the child resides with another party.

On appeal both parties recognize the parental preference rule which recognizes the rights of natural parents as against others with no permanent or legal right to custody. The law is clear that:

> "'A parent who is able to care for his children and desires to do so, and who has not been found to be an unfit person to have their custody in an action or proceeding where that question is in issue, is entitled to custody as against grandparents or others who have no permanent or legal right to custody.'"
> (*In re Eden*, 216 Kan. 784, 786, 533 P. 2d 1222.)

(See also, *Herbst v. Herbst*, 211 Kan. 163, 505 P. 2d 294; *Irwin v. Irwin*, 211 Kan. 1, 505 P. 2d 634; and *McGuire v. McGuire*, 190 Kan. 524, 376 P. 2d 908.)

The real issue in this appeal concerns the meaning of the term "custody." Does the appellee have "custody" of Cynthia so as to make this a custody battle between two fit parents? We think so.

Both parties accept 59 Am. Jur. 2d, Parent and Child, § 25, p. 107 which defines "custody" as that which:

> ". . . [E]mbraces the sum of parental rights with respect to the rearing of a child, including his care. It includes the right to the child's services and earnings, and the right to direct his activities and make decisions regarding his care and control, education, health, and religion. . . ."

(See also, *Burge v. City & County of San Francisco*, 41 Cal. 2d 608, 617, 262 P. 2d 6 [1953] and *Patrick v. Patrick*, 17 Wis. 2d 434, 117 N. W. 2d 256 [1962].)

Two Kansas cases, although not expressly discussing the meaning of the term "custody," provide a basis for concluding the appellee does have "custody" of Cynthia. In *Dodd v. Dodd*, 171 Kan. 46, 47, 229 P. 2d 761, custody was awarded to the father from September 1 to May 31 "said child shall remain with and be in the home of his parental grandparents, Mr. and Mrs. W. F. Dodd." The mother contended the effect of the order was to give "custody" of the child to the paternal grandparents as against the natural maternal parent. The court recognized the parental preference rule that a parent is entitled to custody as against a grandparent, but said:

> ". . . [S]uch rule applies only to cases where the sole issue before the trial court is whether the parents or the grandparents are entitled to custody of minor children and has no application to a case where both parents are contending for their custody. We have never held that a father whose home has been broken up and who is otherwise entitled to custody of his child can be deprived of that custody simply because the exigencies of making a living compel him to keep it in the home of his parents or *that a trial court abuses its discretion when—as here—it requires him to keep it there so long*

*as such court deems it to be to the best interest of the child that that be done."*
(Emphasis added.) (p. 49.)

In *Bierce v. Hanson,* 171 Kan. 422, 233 P. 2d 520, the divorced father was awarded custody of the child. The mother remarried and went to Idaho. She later sought to change the custody arrangements. That opinion reveals the divorced father's mother had taken care of the child since the divorce. Even though the divorced father was married to another woman with whom he lived about eighteen months, the child was with him and his new wife only occasionally during the weekends. Although the custody order in that case did not mention the child residing with the paternal grandparents, the trial court was apprised of the situation because alimony money deposited with the district court had been transferred to the paternal grandparents for the support and maintenance of the child. In the *Bierce* case the divorced father testified:

". . . [I]f the custody was not changed the child would continue to reside with his parents and he and his parents would continue to care for him." (p. 425.)

The foregoing situation was approved by this court.

The *Bierce* case is distinguished somewhat by the fact the divorced father in that case paid $10 a week to his mother for child support, whereas here the appellee has contributed nothing to the Kitchens for Cynthia's support. However the uncontroverted evidence indicates the appellee has offered money to the Kitchens for Cynthia's care, but that they had refused it. The Kitchens cannot be forced to accept money in this case and we hold the *Dodd* and *Bierce* cases controlling.

See also, *Richardson v. Richardson,* 211 Kan. 172, 505 P. 2d 690, and *Schreiner v. Schreiner,* 217 Kan. 337, 537 P. 2d 165, where this court approved situations where the father had "custody" but where the children "resided with" grandparents.

Based on these cases, we believe the appellee exercised sufficient decision-making power regarding Cynthia's care and control, education, health, and religion to constitute "custody."

The appellant places primary reliance on *Stout v. Stout,* 166 Kan. 459, 201 P. 2d 637. There the divorce decree awarded custody of two small children to the mother, who immediately left them with her parents in whose actual custody they thereafter remained. Eight years later the father, who had served in the armed forces for a considerable length of time, sought a change of custody because he had been discharged from the army and was remarried. The mother

stated that she did not believe either she or her ex-husband should have the children. The record was devoid of any evidence showing that she was willing or in a position to take the children. Thus the sole issue was whether the father or maternal grandparents were entitled to custody of the minor children. This court gave custody to the father. It held:

". . . [I]n a child custody proceeding, instituted by a father to obtain the custody of children awarded to their mother by an order made some eight years before, *where the mother concedes she does not desire or seek custody of her children,* who, under the undisputed evidence have been in the actual custody of her parents from the date she obtained the initial order and *when all interested parties contend and repeatedly assert the sole issue is whether the father or the maternal grandparents are entitled to their custody,* the district court abused its sound judicial discretion in refusing to change the original order and in adjudging that the sole and complete care, custody and control, of the children be left with the mother. The effect of its order was to merely continue custody in the grandparents." (Emphasis added.) (p. 463.)

The *Stout* case is an example where the trial court's "custody" decision involved a "sham." The effect of its order was to merely continue custody in the grandparents. Here, however, the appellee has retained an interest in the supervision and control of Cynthia unlike the mother in the *Stout* case. The appellee here has indicated he is willing to have actual physical custody of Cynthia, and he intends to keep reviewing the situation so that at a future date as Cynthia grows older and becomes more understanding, she can be taken into his home. In our opinion the trial court's decision does not constitute a "sham" custody order.

A California case, *Moffitt v. Moffitt,* 242 Cal. App. 2d 580, 51 Cal. Rptr. 683 (1966), supports the appellant's position. There the divorced father was awarded "custody" but the paternal grandparents had "physical custody" of the children involved. The mother sought to change this arrangement. The father proposed continuation of his parents' home as the childrens' residence. He testified that he himself came to his parents' home only on weekends, being employed at another location. The California court held for the mother and stated:

". . . Custody may not be given to grandparents over the resistance of a fit parent; an award of nominal custody to a fit parent violates the rule [of parental preference] if it has the practical effect of placing care and control in the grandparents, denying it to the other fit parent. . . ." (p. 583.)

We believe this position contrary to our rule announced in *Dodd v. Dodd,* supra; *Bierce v. Hanson,* supra; *Richardson v. Richardson,*

supra; and *Schreiner v. Schreiner*, supra. Futhermore the California Court of Appeals' position seems inconsistent with the California Supreme Court's definition of "custody." In *Burge v. City & County of San Francisco*, supra, it is stated:

"Custody embraces the sum of parental rights with respect to the rearing of a child, including its care. It includes the right to the child's services and earnings . . . and the right to direct his activities and make decisions regarding his care and control, education, health and religion. . . ." (p. 617.)

The *Burge* opinion goes on to indicate:

". . . [I]t is common practice in divorce cases for the court to award 'legal custody' to one or both parents and 'physical custody' to one parent . . . *or physical custody may even be awarded to a third person,* usually a relative. . . ." (Emphasis added.) (p. 618.)

Suffice it to say we do not find the *Moffitt* decision controlling in this dispute.

Here the appellant attempts to show an abuse of judicial discretion. In *Stayton v. Stayton*, 211 Kan. 560, 506 P. 2d 1172, abuse of judicial discretion was described as:

"Judicial discretion is abused when judicial action is arbitrary, fanciful or unreasonable, which is another way of saying that discretion is abused only where no reasonable man would take the view adopted by the trial court. If reasonable men could differ as to the propriety of the action taken by the trial court then it cannot be said that the trial court abused its discretion. All judicial discretion may thus be considered as exercisable only within the bounds of reason and justice in the broader sense, and only to be abused when it plainly overpasses those bounds." (p. 562.)

After a careful review of the entire record we are unable to say the trial court abused its discretion in making its custody order.

The judgment of the lower court is affirmed.