No. 23,208.

MABEL JENDELL, *Appellee*, v. J. H. DUPREE and ELLA DUPREE, *Appellants*.

### SYLLABUS BY THE COURT.

1. MINORS—*Right of Parents to Have Custody of Their Children.* Courts will not take from parents the custody of their children upon a charge of unfitness to maintain and care for them unless the charge is sustained by clear and satisfactory proof.

2. SAME—*Mother Entitled to Custody of Her Children.* The evidence examined and held to be sufficient to support the finding of the trial court that the petitioner, the mother of the children whose custody is involved, is not an unfit person to be entrusted with their custody and care.

Appeal from Ford district court; LITTLETON M. DAY, judge. Opinion filed February 12, 1921. Affirmed.

*Albert Watkins,* and *Arthur C. Scates,* both of Dodge City, for the appellants.

*L. A. Madison,* and *Carl Van Riper,* both of Dodge City, for the appellee.

The opinion of the court was delivered by

JOHNSTON, C. J.: The custody of two little girls and the fitness of their mother, Mabel Jendell, to rear them are the questions involved in this litigation. The girls are respectively nine and seven years of age, and upon the testimony the district court held that the mother was not an unfit person to have the care of her children and awarded their custody to her. The respondents are the grandparents of the children in whose custody they had been placed for a time, and they appeal from the judgment.

It appears that about eleven years ago the petitioner was married to Lloyd Dupree, the son of the respondents, and to them the two children were born. They lived a somewhat transitory life for some time, moving from place to place; the husband worked in a garage as foreman of a motor company, engaged in railroading, conducted a drug store, studied medicine, and located upon a land claim in Colorado and was seized with an illness which caused his death in October, 1918. After the children reached school age they were left with the respondents a part of the time and were sent to school, and during these periods the respondents appear to have furnished them clothing and schoolbooks. At one time when they were in school their father paid the respondents twelve dollars per month for their care during the school year, but at other times they appear to have been cared for by the respondents without compensation. After the death of Dupree the petitioner attended a school of pharmacy, graduated therefrom and is now a registered pharmacist. On May 13, 1919, she was married to Charles Jendell, when they set up a home in Wichita, and the children were kept with them for a time. In September of the following year after a disagreement with his wife, Jendell left home and there is testimony tending to show that it arose over the care of the children. She remarked that he was jealous because of her love for the children. About that time a sister of the petitioner apparently without petitioner's knowl-

edge, wrote a letter to the respondents signing the petitioner's name, suggesting that they take the children, but stating that she, the petitioner, could not think of giving them away permanently. It was stated in substance that her heart was breaking at the thought of parting with them, but that under the circumstances she would let the respondents have the girls and would not take them away unless it was mutually agreed to be for the best. It was remarked that she was practically giving them to the respondents, but upon the basis that sometime when conditions were better they would see that it was right for her to have them again. Jendell, her husband, returned home within a few days after his departure and in a letter to one of the respondents said that the separation was due to a misunderstanding, that he "thought a lot of the little girls and will do anything for them I can. I love Mabel and will try to be happy." A few months later and when the petitioner and her husband had purchased a home, they asked respondents for the return of the children. Their refusal of the request is based on the fact that the children were given into their custody about eight months before, and further, that the petitioner was not a fit person to be entrusted with their custody. There was no adoption of the children by the respondents, no complete surrender of them by their mother, and it cannot be said that they were in the custody of the respondents long enough to create a filial affection or make the bond of attachment between them strong nor yet to weaken the love of the mother for them. She had parted with them when her circumstances were untoward and promptly reclaimed them when the circumstances changed, and she procured a home in which they could be reared. There being no irrevocable agreement of surrender and no enforceable legal right of the respondents as against the best interests of the children, the only question open for determination is the right and fitness of the petitioner to be entrusted with their care and custody. It may be premised that the father having died, the surviving parent is the natural guardian of her children and has the primary and predominant right to their custody. It is, of course, not an absolute right, and if she is an unfit person or the well-being of the children will be better subserved by entrusting their care to others, she may be denied the custody. Because of the family

relation and the natural right thereunder, as well as parental affection, courts are slow to take children from a parent and place them in the custody of a stranger and will not do so upon a charge of unfitness unless the charge is sustained by clear and satisfactory proof. (*Pinney v. Sulzen,* 91 Kan. 407, 137 Pac. 987.)   In the cited case it was held:

"Courts will not disturb the family relation nor take a child from its parent merely because a third person seeking its custody may have larger means and is therefore able to give the child greater comforts, wider education and the promise of a larger inheritance." (Syl. ¶ 3.)

While the petitioner and her husband are of quite limited means, they have procured a modest but comfortable home and her husband is employed as a mechanic and is earning from $175 to $200 a month. They appear to be able as well as willing to make reasonable provision for the care and education of the children.

As to the fitness of the mother to care for her children it is contended that she is quick tempered and quarrelsome, that she indulges in coarse and profane language, has not a permanent and suitable home, and is not a woman of good moral character. The charge that the petitioner had immoral relations with other men was not sustained, and apart from the use of improper language at times, it cannot be said that she was immoral in character. That she had quarrels with her husband is conceded but she testified that these were not provoked by her misconduct. There was testimony that on occasions she had shown exhibitions of temper and indulged in language more vehement than wise or elegant. On the other hand, a number of her neighbors and persons closely associated with her testified that they had never heard her use profanity or coarse language. She admitted that when provoked to anger she had in the past used improper language, but said that she had determined to exercise self-control and had ceased to use such language. In its opinion, the trial court in weighing the evidence on the charge said:

"Now considering all the evidence in this case, while the evidence shows that this plaintiff swears sometimes when she gets mad, and she is a woman of rather high temper, yet people disagree as to what constitutes swearing. Nobody told what she said, except some of them said she would say 'Oh, darn,' or 'damn,' or something of that kind. That would not be classified as swearing. It is reprehensible and it is a thing that ought to be avoided."

The trial court deplored the use of rough language and its unwholesome influence on children, but stated that in its opinion the conduct of men and women should be measured by the same standard, and upon the testimony it could not hold that the misconduct of the petitioner in this respect rendered her unfit to have the possession and care of her children. We are not disposed to minimize or excuse the use of the language attributed to her, especially by one who is rearing children, but if an occasional outburst of temper and the use of coarse and offensive speech were treated as sufficient grounds for depriving parents of the custody of their children, many families might be disrupted. Her manifest love for her children and her testimony that she had ceased to use improper language were doubtless given consideration by the trial court in deciding that the custody and control of the children should not be taken from her. The testimony shows that she was very strongly attached to the children and kept them "clean and neat," and was deeply concerned for their welfare. The love of a mother for her children cannot be measured by the courts, and while the respondents treated them with generous kindness and greatly desire their custody and probably are better able to maintain and educate them, these considerations alone are not sufficient for a transfer of the custody. As said in *Buchanan v. Buchanan*, 93 Kan. 613, 616, 144 Pac. 840, "mother love and care may far outweigh financial means and prospects. . . . Common experience and observation alike teach that property is not always the best heritage." (See, also, *In re Hollinger*, 90 Kan. 77, 132 Pac. 1181; *Purdy v. Ernst*, 93 Kan. 157, 143 Pac. 429; *In re Brown*, 98 Kan. 663, 159 Pac. 405; *In re Ziegler*, 103 Kan. 901, 176 Pac. 974.)

A number of witnesses testified in favor of the fitness of the petitioner to maintain and care for her children and the court who had a closer view of the parties and witnesses, had determined that she is not unfit for the trust. In a somewhat similar case it was said:

"Since the trial court found that the father was a fit person in all respects to have the custody of his infant son, and the mother was dead, the law of the land accords with the law of nature, and there is no just law under the sun which would deny him that custody, no matter how reluctantly an affectionate grandparent may yield thereto." (*Crews v. Sheldon*, 106 Kan. 438, 439, 186 Pac. 498.)

The judgment of the district court is affirmed.