No. 40,751

In the Matter of the Application of Jacob Alan Vallimont for a Writ of Habeas Corpus. JACOB ALAN VALLIMONT, *Appellee* v. SAM MEDFORD and PEARL MEDFORD, *Appellants.*

(321 P. 2d 190)

Opinion filed January 25, 1958.

*Leon N. Roulier,* and *Gerald C. Stover,* of Colby, were on the briefs for appellants.

*Sam W. G. Lowe,* of Colby, argued the cause, and *E. F. Beckner,* and *Keith R. Willoughby,* of Colby, were with him on the briefs for appellee.

The opinion of the court was delivered by

SCHROEDER, J.: This is an appeal in an action for a writ of habeas corpus brought by the father against the maternal grandparents requesting the care, custody and possession of his two minor daughters, Alana, born April 22, 1954, and Pamela, born July 20, 1955.

For clarity the appellants will be referred to as the grandparents or respondents and the appellee will be referred to as the father or petitioner.

The question presented is whether the evidence introduced by the grandparents, which sought to prove that the father was unfit to have the custody of his two minor daughters, was sufficient to withstand a demurrer.

The uncontroverted facts are that the father is a Staff Sergeant in the United States Air Force and is stationed at Ft. Warren Air Base at Cheyenne, Wyoming. He and Beverly Ann Vallimont, the natural mother of said minor children, were married on the 25th day of June, 1953, and divorced in Cheyenne, Wyoming, by an order which became final on the 2nd day of July, 1956. The exclusive control and custody of the minor children were given to the natural mother in the divorce action. Thereafter the children lived with the maternal grandparents, Sam and Pearl Medford, on their farm in Thomas County, Kansas. The father remarried on July 7, 1956, and the natural mother was accidentally killed in an automobile accident on December 14, 1956.

This action for a writ of habeas corpus was commenced on the 16th day of January, 1957, in the district court of Thomas County, Kansas, and trial was had on the 11th day of February, 1957. The fitness of the natural father to have custody of his children was not an issue in the divorce action and no finding thereon is indicated. The fitness of the natural father was raised for the first time when the grandparents filed their return to the writ of habeas corpus.

At the close of the respondents' evidence the petitioner's demurrer to the evidence of the respondents was sustained. The trial court thereupon ordered that the writ be granted and that the minor children be delivered to petitioner. The children were then delivered to the petitioner and he has had them since that date.

Appeal was taken by the respondents from the judgment of the lower court sustaining the demurrer of the petitioner to the evidence of the respondents.

The facts in this case are controlled by a rule of law in custody cases to which this court has adhered for a number of years. It is succinctly stated in *Christlieb v. Christlieb*, 179 Kan. 408, 295 P. 2d 658, as follows:

"It is a firmly-established rule in this state that a parent who is able to care for his children and desires to do so, and who has not been found to be an unfit person to have their custody in an action or proceeding where that question is in issue, is entitled to the custody of his children as against grandparents or others who have no permanent or legal right to their custody, even though at the time the natural parent seeks their custody such grandparents or others are giving the children proper and suitable care and have acquired an attachment for them. . . ." (p. 409; see cases cited therein.)

Recent decisions in which this court adhered to the foregoing rule are *Leach v. Leach,* 180 Kan. 545, 306 P. 2d 193; and *Heilman v. Heilman,* 181 Kan. 467, 312 P. 2d 622.

On facts similar to the instant case this court said the natural rights of the father were not completely annulled by the order in the divorce proceeding awarding the custody of the child to the mother. They were suspended for the time being, but they were revived in full force by the mother's death. (*In re Hollinger,* 90 Kan. 77, 132 Pac. 1181. See, also, *May v. May,* 162 Kan. 425, 427, 176 P. 2d 533, on similar facts.)

But for the fact that respondents assert in their brief that the welfare and best interests of the children are the paramount consideration in a custody case of this type, further consideration of our cases would be unnecessary. Whether the rule asserted by the respondents has application in the instant case becomes material because the trial court in stating its reasons for the ruling on the demurrer led respondents to believe, that had the welfare and best interests of the children been of paramount consideration, the decision would have been to the contrary. Under this rule the trial court has wide discretion in custody cases. In support thereof the respondents cite *Jackson v. Jackson,* 181 Kan. 1, 309 P. 2d 705; *Moyer v. Moyer,* 171 Kan. 495, 233 P. 2d 711; and *In re Jackson,* 164 Kan. 391, 190 P. 2d 426. Attention will be devoted to the last case cited later in this opinion. The first two cases cited involve proceedings in which the custody of the children is an issue between the parents.

It is definitely established that when the custody of children becomes an issue as between parents, the primary question to be determined by the court is the welfare and best interests of the children, and all other questions are subordinate thereto. In addition to the *Jackson* and *Moyer* cases cited we would add: *Collins v. Collins,* 177 Kan. 50, 276 P. 2d 321; and *Pearson v. Pearson,* 176 Kan. 306, 270 P. 2d 205, among many others. But this is not the

situation presented by the facts in the instant case. Here the father seeks custody from the maternal grandparents.

Some confusion has arisen regarding this court's application of the rule of law stated in *Christlieb*. This is indicated by respondents' contention. (See, 5 Kan. Law Rev., pp. 260 to 263.)

The reason for the *Christlieb* rule is well stated by Justice Dawson in the case of *In re Kailer*, 123 Kan. 229, 255 Pac. 41, (cited in *Christlieb v. Christlieb*, supra) where it was said:

"Noting respondents' objections to this judgment, it is urged that the welfare and best interests of the children were the paramount issue. Under the law of the land the welfare and best interests of children are primarily the concern of their parents, and it is only when parents are unfit to have the custody, rearing and education of children, that the state as *parens patriae*, with its courts and judges, steps in to find fitting custodians *in loco parentium*.

. . . . . . . . . . . .

"Putting the matter in another way, it is quite correct to say that the welfare of children is always a matter of paramount concern, but the policy of the state proceeds on the theory that their welfare can best be attained by leaving them in the custody of their parents and seeing to it that the parents' right thereto is not infringed upon or denied. This is the law of the land on this subject. And it never becomes a *judicial* question as to what is for the welfare and best interests of children until the exceptional case arises where the parents are dead, or where they are unfit to be intrusted with the custody and rearing of their children and have forfeited this right because of breach of parental duty, or where the right has been prejudiced by the discord of the parents themselves. There are enough of the latter sort of cases where the courts are compelled to interfere and take the custody of children from unfit parents, or to decide which of quarreling parents should have that custody- . . ." (pp. 230, 231.)

In the case of *In re Jackson*, supra, where grandparents sought to obtain custody of a minor child from his father in a habeas corpus proceeding, considerable language was used which supports respondents' contention that the welfare and best interests of the children is the paramount consideration in a case of this type.

This court in *Stout v. Stout*, 166 Kan. 459, 201 P. 2d 637, on similar facts, undertook to clarify the law on this point where it said at page 465:

". . . It will suffice to say that if there is any language to be found in any of our decisions justifying the construction that the children of a natural parent may be given to third persons without a finding such parent is an unfit person to have their custody it should be and is hereby disapproved."

*In re Jackson*, supra, and the case from which it quoted extensively, *Chapsky v. Wood*, 26 Kan. 650 (1881), were considered

in the *Stout* case. Without further elaboration reference is made to the *Stout* case, which should be sufficient to dispose of the respondents' contention. Those interested will find an excellent review of the entire subject in 1 Kan. Law Rev., pp. 37 and 165.

By statute the father and mother are the natural guardians of the persons of their minor children. If one dies, natural guardianship devolves upon the other. ( G. S. 1949, 59-1802, and see, *Denton v. James,* 107 Kan. 729, 193 Pac. 307.)

At the close of the petitioner's evidence it was determined by the trial court, without objection by the parties, that the burden of proof then shifted from the petitioner to the respondents to show that the petitioner was an unfit person to have custody of his children.

Our inquiry is next directed to the burden of proof cast upon respondents. It has been held that a court will not deprive a parent of the custody of his minor children upon a charge of unfitness unless the charge is established by *clear and convincing evidence.* (*In re Underwood, Petitioner,* 103 Kan. 505, 175 Pac. 380; See, also, *Pinney v. Sulzen,* 91 Kan. 407, 137 Pac. 987; and *Jendell v. Dupree,* 108 Kan. 460, 195 Pac. 861,—requiring clear and satisfactory proof.)

What is the meaning of the term "unfit" as applied to the relation of rational parents to their children? On the issue of a father's fitness this court said in *Pinney v. Sulzen,* supra, that "courts do not hesitate to take a child from its parents and give it to a stranger if the parents treat the child with cruelty, keep it in vicious or disreputable surroundings, or are unfit to be entrusted with its custody and control by reason of their habits, character or condition." ( p. 412.) Quoted with approval in the *Pinney* case is *Clarke v. Lyon,* 82 Neb. 625 ( Syl. ¶ 4), 118 N. W. 472, which said:

"The unfitness which deprives a parent of the right to the custody of his children must be positive, and not comparative, and the mere fact that the children would be better nurtured or cared for by a stranger is not sufficient to deprive the parent of his right to their custody."

A limitation to the meaning of unfitness is indicated by *In re Hollinger,* supra, where it was said that the court will not disturb the normal family relation nor take a child from its parents because a third person seeking its custody may have larger means and is therefore better able to give the child greater comforts, wider education and the promise of a larger inheritance. ( See,

*Wood v. Lee*, 123 Kan. 669, 256 Pac. 797; *Buchanan v. Buchanan*, 93 Kan. 613, 144 Pac. 840; and cases cited therein.)

A further limitation is disclosed in *Jendell v. Dupree*, supra, where this court said:

". . . We are not disposed to minimize or excuse the use of the language attributed to her, especially by one who is rearing children, but if an occasional outburst of temper and the use of coarse and offensive speech were treated as sufficient grounds for depriving parents of·the custody of their children, many families might be disrupted. . . ." (p. 464.)

It was said the right of a father to have the custody and control of his child might be forfeited by *conduct* showing him to be *manifestly unfit* in *Swarens v. Swarens*, 78 Kan. 682, 97 Pac. 968.

By a statute in full force at the time of hearing, G. S. 1949, 38-402, the juvenile court was empowered to take as "dependent and neglected" a child from its parents having custody, where the home was an *unfit* place for such child *by reason of neglect, cruelty or depravity on the part of its parents*. This statute also empowered the juvenile court to take a child as "dependent and neglected" where for any reason the child was destitute or homeless or abandoned or dependent on the public for support; who did not have proper parental care or guardianship; and who was found living in a house of ill fame or with vicious or disreputable persons.

We think it entirely plain that misconduct on the part of.parents which would empower a juvenile court to take jurisdiction of a child as "dependent and neglected" is likewise such breach of parental duty as to make the parents unfit to be entrusted with the custody and rearing of their child in a custody award matter.

G. S. 1949, 38-402, was repealed by Laws of 1957, Chapter 256, which adopted the Kansas Juvenile Code, effective July 1, 1957. The new code provides that when parents are found and adjudged to be *unfit persons* to have the custody of a "dependent and neglected child," the juvenile court may make an order permanently depriving such parents of their parental rights. (Laws of 1957, Ch. 256, Sec. 24 [c].) The code defines a "dependent and neglected child" as a child less than sixteen years of age:

"(1) Whose parent neglects or refuses, when able so to do, to provide proper or necessary support and education required by law, or other care necessary for his well being;

"(2) who is abandoned or mistreàted by his parent, . . .·

"(3) whose occupation, environment or *association is injurious to his welfare;*" (Laws of 1957, Ch. 256, Sec. 2[g].) (Emphasis added.)

While the standard of fitness required of parents is difficult to specify without being somewhat ambiguous, conduct which makes a parent unfit may be defined within limits. There is no statutory definition of the word "unfit." It therefore must be given its ordinary significance, having due regard to the context. In general, the word means unsuitable, incompetent, or not adapted for a particular use or service. As applied to the relation of rational parents to their child, the word usually although not necessarily imports something of moral delinquency. Parents who treat the child with cruelty or inhumanity, or keep the child in vicious or disreputable surroundings, are said to be unfit. Parents who abandon the child, or neglect or refuse, when able so to do, to provide proper or necessary support and education required by law, or other care necessary for the child's well being are said to be unfit. Violence of temper or inability or indisposition to control unparental traits of character or conduct, might constitute unfitness. So, also, incapacity to appreciate and perform the obligations resting upon parents might render them unfit, apart from other moral defects.

It is argued in the brief of the respondents that the evidence shows the petitioner to be unfit to have the care and custody of his children. Much of respondents' evidence was devoted to the fine character and home of the respondents which was conceded by the petitioner. Their financial statement disclosed that they were worth in excess of $500,000.00. The testimony disclosed that during the early part of petitioner's military service, they had furnished money for clothes, groceries and various things to the extent of $1,049.83, which has never been repaid during the marriage of petitioner to their daughter. They complained that a long distance call made by petitioner two days before the burial of their daughter, Beverly, was made collect.

On the issue of petitioner's fitness to have the custody of his children, the cumulative effect of the most favorable statements in respondents' evidence, including favorable inferences thereon, for respondents might be construed to disclose on the part of the petitioner an attitude of hostility toward his children and cruel treatment of them during his marriage to Beverly.

Actually, the net result of respondents' evidence on the unfitness of petitioner is rather meager. To illustrate, the attorney employed by Beverly to represent her in the divorce action was called from Colorado Springs to testify. The most favorable aspect of the

testimony for respondents was that petitioner had struck his wife more than once and that the children (both under three years of age at the time of the divorce) had been struck. Witness on cross examination stated that petitioner had come to his office in Cheyenne, Wyoming, after the divorce action was filed hoping to effect a reconciliation and during the course of conversation admitted striking Beverly once. It was apparent that this was the incident that sent her to the attorney's office. The testimony as a whole could not possibly be construed to show that petitioner struck his children.

Most of the other incidents concerning which testimony was given occurred during the Christmas season of 1954, more than eighteen months prior to the divorce, when petitioner and Beverly visited for three weeks with the respondents. The oldest child at that time was less than a year old and just learning to eat. She was messy and noisy when she ate with the family. Petitioner was described as becoming disgusted and hostile with the child when she spilled things on these occasions, which usually upset the family at mealtime. It was said he complained and argued when the child cried at night, and that he hollered at Beverly or the child continually, which would always have the house in an uproar before he went to bed; that he could not seem to stand the children and refused to take care of them. It was said that after a Christmas party in Winona, during the visit with respondents, petitioner bought beer and liquor for himself and three other boys who drove to Oakley where they drove up and down the street looking for girls.

The oldest child in May, 1956, when brought to the repondents' home pending the divorce was said to be nervous and needed medicine to quiet her down.

The petitioner testified that he was serving in the United States Air Force on his second term of enlistment; that he had received an honorable discharge after his first enlistment and was presently an instructor. He further testified that he had never had any time for misconduct in the service; was making adequate pay and allowances for the support of his children; was a member of the Protestant Church and attends church on the Air Base. He further testified that he had been awarded the Good Conduct Medal, had a life insurance program and had never had any bad time for misconduct in the service; that he had been cleared by the Air Force

to handle secret information, has no drinking habits, and had never been involved in any conduct unbecoming to his rank.

On oral argument the case was presented as one involving a demurrer to the evidence of the respondents. But it appears from the record that the trial court treated the matter as a full and final submission after all of the evidence was in. *(In re Underwood, Petitioner,* supra.) After respondents' evidence was in and a demurrer was lodged thereto by the petitioner, the trial court said: ". . . I want the present wife of the petitioner on the witness stand." The court reserved ruling and Clarice Vallimont, petitioner's present wife, took the stand and testified making a commendable statement regarding herself, her experience and her love of children.

On rendering the decision the trial court, after acknowledging the great number of cases of this type cited to the court, said:

"We have some testimony in this case as to bad conduct on the part of the plaintiff. I don't think it goes anything like as far—I certainly couldn't *construe* it as being anything even remotely close to being as strong as the argument made on behalf of it, . . ." (Emphasis added.)

Then, after reviewing some of the evidence presented, it was further said:

"There isn't much testimony, of course, about the relationship between the plaintiff and his deceased wife. Of course, the court can't do anything but assume it wasn't good, at least, possibly one time, and, most certainly, during the last months of that relationship."

The court then recognized that it was compelled to follow the law and make an honest decision, and further said:

"It is agreed here that the Medfords would provide for these children a very fine home. I can't decide anything else but that that would be a fact, that they would make these children a very fine home.

"But they are not their children. They are the children of Sergeant Vallimont, and it is the rule of the Supreme Court that, unless it is shown to this court, that he is an unfit person to raise those children, he should have their custody.

"And, I will further say, as a matter of law, that *the court in finding that is not finding that for the reason*—even if the grandparents were multimillionaires and this petitioner were a pauper, the courts have said many, many times that that is not a factor; and many, many times the children of paupers are raised happier, more able, and better—and, going back to some of our most famous men, I might mention Abraham Lincoln in comparison to the children of some of our millionaires . . . the matter of wealth doesn't make a child's upbringing either happy or good." (Emphasis added.)

Viewing respondents' evidence strictly on demurrer—taking all of it as true, considering only that favorable, together with all reasonable inferences to be drawn therefrom, and disregarding that unfavorable, weighing no contradictory parts or differences between direct and cross examination—technically it presented a sufficient case, (*Jones v. Coate,* 180 Kan. 597, 306 P. 2d 148) and the demurrer should have been overruled. But the court did not so consider the evidence. The net result of testimony by respondents' witnesses had little substance to prove petitioner's unfitness. Surely respondents did not intend to ask the trial court to implicitly believe their witnesses on the first part of their testimony and utterly to disbelieve them as to the latter part on the issue of petitioner's fitness. Conceding that it was error to sustain the demurrer to the respondents' evidence, we may not disregard the provisions of our civil code (G. S. 1949, 60-3317) which reads:

"The appellate court shall disregard all mere technical errors and irregularities which do not affirmatively appear to have prejudicially affected the substantial rights of the party complaining, where it appears upon the whole record that substantial justice has been done by the judgment or order of the trial court; and in any case pending before it, the court shall render such final judgment as it deems that justice requires, or direct such judgment to be rendered by the court from which the appeal was taken, without regard to technical errors and irregularities in the proceedings of the trial court."

(See, *State v. Order of Eagles,* 100 Kan. 480, 164 Pac. 1063.)

On all the evidence presented by the record there was hardly a serious approach to the sufficiency of evidence required under the rule that in order to deprive the parent of the custody of his children his unfitness must be established by clear and convincing evidence. (See facts in: *Crews v. Sheldon,* 106 Kan. 438, 186 Pac. 498; and *Lindbloom v. Lindbloom,* 177 Kan. 286, 279 P. 2d 243.)

With all the evidence before us, and the review thereof by the trial court with its finding that respondents had not shown petitioner to be an unfit person to raise his children, it cannot be said that any error was committed in awarding the custody of the children to the petitioner upon full consideration of the entire evidence, which in fact was done. (See, *In re Underwood, Petitioner,* supra; and *State v. Order of Eagles,* supra.)

Respondents contend that the trial court did not make a finding that the father was a fit person. They cite *Monroe v. Slaughter,* 171 Kan. 614, 237 P. 2d 372, in support thereof. The court was

there confronted with a writ of habeas corpus for the custody of a child between a father and the child's uncle and aunt, in which the fitness of the father to have custody was an issue, and the lower court granted custody to the uncle and aunt without making a definite finding on the issue of the father's fitness. There the cause was remanded with directions to the court below to make a definite finding on such issue. It does not follow that the trial court in the instant case must make a finding on the issue of the petitioner's fitness. Here the respondents did not sustain their burden of proof on the issue of unfitness and the custody was granted to the father. The presumption of fitness with which the father was clothed, as bolstered by his own testimony, had not been overcome by the evidence presented against him. (*In re Jackson,* supra.) In the *Monroe* case it was mandatory under the *Christlieb* rule to find the father unfit before the uncle and aunt were eligible to take the custody. (*Stout v. Stout,* supra.)

Respondents specify as error the exclusion of statements made by petitioner's first wife, Beverly, to her sister in November and December, 1956. There being no contention that these were dying declarations, or other affirmative showing in the record that this was error, they were properly excluded.

Treating the case, therefore, as one decided upon its merits, the judgment of the lower court granting the writ is affirmed.