34

(690 P.2d 965)
No. 56,393

EDWARD L. TINDELL, *Appellant,* v. DONITA L. TINDELL, Deceased, *Appellee,* DON and LOUISE SEDLACEK, *Intervenors/Appellees.*

Opinion filed November 21, 1984.

*James S. Willard,* of Scott, Quinlan & Hecht, of Topeka, for the appellant.

*Lawrence P. Ireland,* of Ireland and Enright, of Topeka, for the intervenors/appellees.

Before FOTH, C.J.; TERRY L. BULLOCK, District Judge, Assigned; and FREDERICK WOLESLAGEL, District Judge Retired, Assigned.

BULLOCK, J.: After an evidentiary hearing under K.S.A. 60-1610(a)(4)(D), the trial court found probable cause existed to believe Edward Tindell was unfit as a parent, and that it was in the best interests of his two daughters to grant temporary custody to Don and Louise Sedlacek (intervenors in this action), the parents of Edward's deceased wife. The trial court then referred

the case to the district attorney for proceedings pursuant to K.S.A. 1983 Supp. 38-1531 *et seq.*, again as required by K.S.A. 60-1610(a)(4)(D). Edward appeals from the order of temporary custody. Three issues require discussion.

I. The first issue is whether this appeal is premature, inasmuch as the order appealed from was temporary in nature. K.S.A. 60-1610(a)(4)(D) provides that temporary custody orders in cases such as this are to be entered in lieu of orders under Chapter 38, the Kansas Code for Care of Children. Once the temporary custody is ordered, the district attorney is instructed to file a petition under K.S.A. 1983 Supp. 38-1531. Thereafter, all proceedings are pursuant to Chapter 38. K.S.A. 1983 Supp. 38-1591(a) provides that any interested party may appeal any order of temporary custody in any proceeding pursuant to that code. In our view, the posture of this action is now one under Chapter 38 and orders under 60-1610(a)(4)(D), like their Chapter 38 counterparts, are appealable.

II. The second issue is Edward's contention that the trial court erred in finding him unfit as a parent. In this connection, Edward seems to make two arguments. First, the trial court erroneously applied a "best interests of the child test," not a "fitness test," in granting custody to the grandparents; and second, the finding of unfitness, if one was made, was not supported by substantial competent evidence.

Under K.S.A. 60-1610(a)(4)(D) the court may award temporary custody to nonparents if:

1.  (a)  The court finds probable cause to believe that the child is in need of care as defined in sections (a)(1), (2) or (3) of K.S.A. 38-1502; *or*
    (b)  there is probable cause to believe that neither parent (or one, if there be but one, as here) is fit to have custody; *and*
2.  it is in the best interests of the child to award temporary custody to the nonparent.

In the case at bar, the trial court commented, prior to ruling,

"The two issues—the principal issue is fitness. The second area issue is, what's in the best interest of the children in the event the Court would determine that the father is not fit."

In our view, the record thus clearly shows that the trial court did not use the best interests of the child standard alone but

correctly first judged whether or not there was probable cause to believe Edward was unfit as a parent and then determined the best interests of the children. See *Sheppard v. Sheppard,* 230 Kan. 146, Syl. ¶ 3, 630 P.2d 1121 (1981), *cert. denied* 455 U.S. 919 (1982).

III. Edward's final contention is that the trial court's probable cause finding of unfitness is not supported by substantial competent evidence. Before reviewing the evidence, it is helpful to examine our controlling definition of "unfitness" and relevant cases concerning the quantum of evidence necessary to support findings of probable cause.

In establishing a working definition of "unfit," the Supreme Court has stated:

" 'While the standard of fitness required of parents is difficult to specify without being somewhat ambiguous, conduct which makes a parent unfit may be defined within limits. There is no statutory definition of the word "unfit." It therefore must be given its ordinary significance, having due regard to the context. In general, the word means unsuitable, incompetent, or not adapted for a particular use or service. As applied to the relation of rational parents to their child, the word usually although not necessarily imports something of moral delinquency. Parents who treat the child with cruelty or inhumanity, or keep the child in vicious or disreputable surroundings, are said to be unfit. Parents who abandon the child, or neglect or refuse, when able so to do, to provide proper or necessary support and education required by law, or other care necessary for the child's well being are said to be unfit. Violence of temper or inability or indisposition to control unparental traits of character or conduct, might constitute unfitness. So, also, incapacity to appreciate and perform the obligations resting upon parents might render them unfit, apart from other moral defects.' " *Sheppard v. Sheppard,* 230 Kan. at 153, quoting *In re Vallimont,* 182 Kan. 334, 340, 321 P.2d 190 (1958).

As previously observed, to award temporary custody of a child to a nonparent under K.S.A. 60-1610(a)(4)(D), trial courts are not asked to find that the parent *is* unfit but only that there is *probable cause to believe* the parent unfit. A finding of probable cause requires less evidence for its support than does a finding of unfitness. *Cf. State v. Hays,* 221 Kan. 126, Syl. ¶ 1, 557 P.2d 1275 (1976). This rule presents no threat to nonprevailing parties inasmuch as a fullblown trial on the question of fitness awaits them under Chapter 38. Accordingly, we hold that probable cause exists when the facts and circumstances before the trial court are sufficient to warrant a person of reasonable caution to

believe that a parent is unfit. *Cf. State v. Hays,* 221 Kan. 126, Syl. ¶ 1.

In our view, the record, in the case at bar, contains ample evidence from which a reasonably cautious person could believe Edward is unfit as a parent.

Edward and Donita Tindell were divorced on April 24, 1980. Edward initially received custody of the couple's daughters but on November 21, 1980, custody was changed to Donita. Donita and the girls lived in Nebraska until October, 1982, when they returned to live with Donita's parents in Frankfort, Kansas. Edward visited the children at most three times in the past three years. During the two years Edward lived in Texas, his only contact was a Christmas card and gift, a few early letters and a couple of phone calls. About a week after Edward moved back to Kansas in March of 1983, he did arrange to see his daughters on April 23, 1983. Donita died in an automobile accident on May 25, 1983.

From 1980 to the time of hearing Edward admitted he had not paid "a penny" in child support. In fact, he stated that even though he was making $1,000.00 a month, he couldn't afford to pay the court-ordered child support or send any money for the children although during this same time, he had provided support and a home for his live-in girlfriend (who was married at the time to someone else) and her four children.

The record also reveals Edward is somewhat of a nomad. In the year before the hearing Edward's other daughter Sarah, who lived with him, attended three or four different schools.

Edward is not sure how he would support his children if he got them. He is on unemployment; he has not checked to see what other SRS benefits he will qualify for if he gets the children and he is not sure how long his unemployment will last. He hasn't made any plans for the children "as he hasn't been given their custody yet." Interestingly, he testified that if he had had custody of his daughters he would have lived his life differently; however, he did not seem concerned about how his way of life has affected Sarah, the daughter already in his custody.

Edward testified that he disciplines his children by spanking them with his hand, but stated "when they get a little older you have to use more than just a hand at times." He admitted he had left bruises on his older daughter Sarah. The testimony of Edward's girlfriend also indicated that Edward's notions of disci-

pline may get out of hand. She stated that: "Mr. Tindell has never beat me to the point . . . I had physical bruises all over my entire body, at all. He has never beat even my children where they had bruises all over their bodies."

Two witnesses also testified that they had heard from Edward's girlfriend that Edward had molested her oldest daughter while the "family" lived in Texas. This same girlfriend had also described Edward's relationship with his own sister as that of a "husband and wife," a fact confirmed by the sister's husband, according to the girlfriend.

Consistent with his nomadic history, Edward has lived in four or five different places in the last year. He and his girlfriend have split up two or three times in the two years they have lived together. About three hours after Donita's funeral, Edward told his six-year-old daughter Donnell that she was going to live with him now. The child had not seen her father but once in two and a half years at that time. Surprisingly, the record indicates that Edward believed he handled the matter in a compassionate manner.

Philip Towle, a licensed clinical social worker, testified the girls need therapy and a strong family unit to overcome the trauma of their mother's death. In our view the record provides ample support for the trial court's probable cause belief that Edward was not fit to supply these needs and that it was in the best interests of the children to remain with their grandparents temporarily.

Accordingly, under any standard of review, and certainly under that standard applicable to review of probable cause findings, we conclude the record before us amply reveals substantial competent evidence to support the findings below.

Affirmed.