**M.P., ON BEHALF OF: M.A.**
**v.**
**J.J.M. and E.J.M., re: K.J.A., Minor**

Fam. No. Fm. 25/1994

Territorial Court of the Virgin Islands

Div. of St. Croix

June 16, 1995

EDDY RIVERA, ESQ., *for Plaintiffs*

ALBERT J. MEADE, ESQ., *for Defendants*

STEELE, *Judge*

## MEMORANDUM OPINION AND ORDER

THIS MATTER is before the Court on a complaint filed by the plaintiffs and a counter-claim filed by the defendants to determine the custody of the minor K.J.A. The matter came on for hearing on June 12, 1995 and the premises considered, the Court hereby enters the following opinion and order.

## JURISDICTION

This Court has jurisdiction to hear this cause of action pursuant to the provision of V.I. CODE ANN. tit. 4, § 172(d) (1967 & Supp. 1994) and V.I. CODE ANN. tit. 16, § 117 (1964 & Supp. 1994).

## PROCEDURAL POSTURE

On or about December 30, 1994, M.P. filed on behalf of M.A. (hereinafter "plaintiffs") an action for Permanent Injunction against J.J.M. and E.J.M., (hereinafter 'defendants'), Family No. 25/1994. Plaintiffs contend in their complaint that the defendants were keeping K.J.A., the biological infant son of M.A., without M.A.'s authorization and despite M.A.'s expressed desire to have K.J.A. returned to her. On February 6, 1995, the defendants filed an Answer to the plaintiffs' Complaint denying the allegations and alleging that the plaintiff M.A. had consented to the defendants having permanent custody of the minor K.J.A. On the same day, the defendants filed an Action for Custody of the minor K.J.A., Fam. No. C2/1995. The defendants also filed a motion to convert their petition for custody to a counterclaim to the Action for Permanent Injunction and the same was granted on February 8, 1995. The matter was scheduled for hearing on April 3, 1995 however the hearing was continued to June 12, 1995 due to the fact that plaintiff M.A. resided in Antigua and immigration problems prohibited her from entering the U.S. Virgin Islands. Subsequently, plaintiff M.A. was permitted to travel to the U.S. Virgin Islands for a period of one week to participate in the June 12, 1995 hearing.

## FINDINGS OF FACT

The following persons appeared at the hearing of this cause and gave testimony: plaintiff M.A.; plaintiff M.P., the cousin of M.A.;

and Janet James and Ruthledge Browne, both of whom are close friends of plaintiffs' family. The defendants J.J.M. and E.J.M. appeared, however, only defendant E.J.M. gave testimony. This Court, having heard the testimony of the above mentioned parties and witnesses and being duly advised in the premises, finds as follows:

1. That M.A. is the biological mother of K.J.A.;

2. That K.J.A. was born on September 19, 1992;

3. That prior to the birth of K.J.A., the plaintiff M.A. and the defendants had developed a close friendship;

4. That the plaintiff M.A. is a national of St. Lucia and had over-extended her stay on the island of St. Croix, and shortly after the birth of her son, was compelled by law to leave the U.S. Virgin Islands and return to St. Lucia;

5. That plaintiff M.A. returned to St. Lucia with her son K.J.A. and then shortly thereafter, moved to Antigua;

6. That after M.A. moved to Antigua, the defendants asked her if she would allow K.J.A. to visit with them on St. Croix;

7. That according to the testimony of plaintiff M.A., the defendants were "in love with the child" and she saw no reason why the child could not visit with the defendants on St. Croix;

8. That in February of 1993, plaintiff M.A. allowed K.J.A. to come to St. Croix to visit the defendants;

9. That the child travelled to St. Croix with Janet James, a nurse and friend of plaintiff M.A.;

10. That while no discussion was had among the parties as to the length of K.J.A.'s visit, it is the uncontested testimony of plaintiff M.A. that she hoped to have her immigration problems solved and anticipated that she would be able to return to St. Croix in March of 1993, at which time she would be reunited with K.J.A.;

11. That by March of 1993, plaintiff M.A. had not resolved her immigration problems and was unable to return to St. Croix;

12. That when plaintiff M.A. allowed K.J.A. to come to St. Croix in February of 1993, she sent a notarized handwritten note with the child giving the defendants the "responsibility of caring for my son K.J.A. during my absence";

13. That this document was prepared at the behest of Janet James, who advised plaintiff M.A. to prepare same in the event that the child should become ill or require medical care;

13

14. That in preparing said document, it was never the intention of plaintiff M.A. to transfer legal and/or physical custody of K.J.A. to the defendants;

15. That Ruthledge Browne, a close family friend of plaintiff M.A., who frequently travelled between St. Croix and Antigua, made several attempts to pick-up K.J.A. from the defendants and return him to his mother in Antigua;

16. That on at least four occasions, Mr. Browne intended to take the child with him to Antigua;

17. That Mr. Browne was only able to make contact with the defendants on one occasion and was told by the defendant E.J.M. that he was a stranger to the child and it would be extremely traumatic for the child to travel to Antigua with someone that he did not know;

18. That in November of 1993, defendant E.J.M. informed the plaintiff M.A. via plaintiff's sister Albertha that she was bringing the child to Antigua on Monday, November 15, 1993;

19. That it was the understanding and expectation of the plaintiff M.A. that she would be reunited with her son;

20. That plaintiff M.A. met defendant E.J.M. and K.J.A. at the airport, and it was agreed that because the child did not know the plaintiff M.A. that he would stay with defendant E.J.M. that night and be picked up by his biological mother the following day, Tuesday, November 16, 1993;

21. That K.J.A. stayed with his biological mother from Tuesday, November 16, 1993 to Thursday, November 18, 1993;

22. That defendant E.J.M. requested that before her scheduled return to St. Croix on Monday, November 22, 1993, K.J.A. be allowed to stay with her from Thursday, November 18, 1993 until Sunday, November 21, 1993;

23. That it was the understanding of plaintiff M.A. that she would pick up K.J.A. on Sunday, November 21, 1993 and that he would be remaining in Antigua with her;

24. That on Friday, November 19, 1993, defendant E.J.M. met with the plaintiff M.A. and presented her with documents for her signature;

25. That said documents purported to grant defendants full legal custody of the minor K.J.A.;

14

26. That the defendant E.J.M. had sent these documents to the plaintiff M.A. via mail prior to November of 1993 and plaintiff M.A. never executed the same;

27. That when plaintiff M.A. was presented with the custody documents on Friday, November 19, 1993, she again refused to sign them;

28. That on Sunday, November 21, 1993, when plaintiff M.A. went to get her son from the defendant E.J.M., she learned that the defendant and K.J.A. had left for the airport;

29. That plaintiff M.A. went to the airport only to learn that the defendant E.J.M. and K.J.A. had already left for St. Croix, at which time plaintiff contacted the Antigua police;

30. That the defendant E.J.M. did not contact plaintiff M.A. and advise her of defendant's plans to return to St. Croix on Sunday, November 21, 1993 instead of Monday, November 22, 1993;

31. That although plaintiff M.A. had no telephone at her house, the defendant E.J.M. had notified plaintiff M.A. of her November 15, 1993 arrival in Antigua by telephoning plaintiff's sister Albertha. Therefore, the defendant had access to a telephone number and could have notified the plaintiff of her unexpected and early departure from Antigua if she had any intentions to do so. Furthermore, the defendant also knew where the plaintiff was employed and could have made attempts to contact the plaintiff at that location prior to the defendant's departure;

32. That plaintiff M.A. did not consent to defendant E.J.M. taking K.J.A. back to St. Croix on November 21, 1993;

33. That plaintiff M.A. then sought the advice of an attorney in Antigua to get K.J.A. returned to her;

34. That plaintiff's attorney advised her to be cordial in her dealings with defendants J.J.M. and E.J.M. so as to not cause them to remove the child from the Virgin Islands;

35. That the plaintiff M.A., upon realizing that she would not be able to return to St. Croix in March of 1993 depended on her cousin M.P. to assist her in returning her son to Antigua, including the hiring of counsel to file the above captioned action on M.A.'s behalf in December of 1994;

36. That while there is no dispute that K.J.A. has bonded with the defendants, and knows them as his parents, this bond devel-

15

oped over the time that K.J.A. was held in St. Croix against the wishes of his biological mother, M.A.;

37. That no evidence has been produced which suggests that plaintiff M.A. is incapable of caring for her son K.J.A. or that she is an unfit mother.

38. That it is the uncontroverted testimony of defendant E.J.M. that she has no evidence or reason to believe that plaintiff M.A. is unable to raise and take care of K.J.A. or that she is an unfit mother;

39. That the defendants have presented no evidence that returning K.J.A. to his biological mother would cause him irreparable harm;

40. That plaintiff M.A. is gainfully employed and is able to provide adequate housing and care for K.J.A.

## DISCUSSION

This Court has researched the issue of custody disputes between biological parents and third parties and has been unable to find any published case in this jurisdiction dealing with the issue. In the absence of any precedent in the jurisdiction, the Court is compelled to seek guidance by reviewing the manner in which other jurisdictions have dealt with the issue.

"It has been said that the courts have no greater responsibility or more difficult problem than to decide a question respecting the custody of a child." *Hild v. Hild*, 221 Md. 349, 157 A.2d 442, 443-44 (1959). In determining child custody matters, the court must focus its attention on fashioning a remedy that would serve the best interest and welfare of the child. *Weslie v. Weslie*, 277 Minn. 446, 152 N.W.2d 755, 757 (1967). The paramount consideration is the overall well-being of the child. *Hild*, 157 A.2d at 446.

It is a well established principle of law that when a third person seeks to deprive a parent of custody, the third party cannot do so without first proving that the parent is not a suitable person to have custody of the child. The law establishes a preference for the natural parent and that preference must prevail unless it is established that the natural parent is unfit. *Schuh v. Roberson*, 302 Ark. 305, 788 S.W.2d 740 (1990). The United States Supreme Court adopted this principle in *Stanley v. Illinois*, 405 U.S. 645, 92 S. Ct. 1208, 1212-13 (1972), and stated that "it is cardinal with us that the

16

custody, care and nurture of the child reside first in the parents whose primary function and freedom include preparation for obligations the state can neither supply nor hinder."[1] The reason for the parental preference doctrine is well stated by Justice Dawson in *In re Kailer*, 123 Kan. 229, 230-31, 255 Pac. 41 (1927):

> [I]t is quite correct to say that the welfare of children is always a matter of paramount concern, but the policy of the state proceeds on the theory that the welfare can best be attained by leaving them in the custody of their parents and seeing to it that the parents' right thereto is not infringed upon or denied. This is the law of the land on this subject. And it never becomes a judicial question as to what is for the welfare and best interest of children until the exceptional case arises where the parents are dead, or where they are unfit to be entrusted with the custody and rearing of their children and have forfeited this right because of breach of parental duty, or where the right has been prejudiced by the discord of the parents themselves. There are enough of the latter sort of cases where the courts are compelled to interfere and take the custody of children from unfit parents, or to decide which of the quarreling parents should have that custody—cases which search the hearts and consciences of judges as no other judicial duty does or can do. And no court should construe its intrusive jurisdiction as extending to cases where parents have done nothing offensive to law, morals, or good conduct, which would forfeit their paramount natural right of parenthood, which is to have the custody of their own children.

When a judge is hearing a dispute between the parents, or a parent, and a third party, the parties do not start out even. *In Re Custody of Hernandez*, 376 A.2d 648, 654 (Pa. Super. 1977). There is

---

[1] This principle is known as the parental preference doctrine. The parental preference doctrine was succinctly stated in *Christlieb v. Christlieb*, 179 Kan. 408, 409, 295 P.2d 658 (1956) as follows:
[A] parent who is able to care for his children and desires to do so, and who has not been found to be an unfit person to have their custody in an action or proceeding where that question is in issue, is entitled to the custody of his children as against grandparents or others who have no permanent or legal right to their custody, even though at the time the natural parent seeks their custody such grandparents or others are giving the children proper and suitable care and have acquired an attachment for them.

a general feeling that a child's best interest is served by remaining in a natural parent's custody if at all possible. *F. McG. v. L.U.*, No. 81A-MY-8, slip op. (Del. Super. Ct. October 5, 1982). The parents have a 'prima facie right to custody', which will be forfeited only if "convincing reasons" appear that the child's best interest will be served by an award to the third party. *Hernandez*, 376 A.2d at 654. Therefore, even before the proceedings begin, the evidentiary scale is tipped to the parents' side. What the judge must decide is whether the evidence on behalf of the third party is weighty enough to bring the scale up to even, and down on the third party's side. *Id.*

■ The evidence is uncontroverted that plaintiff is the biological mother of K.J.A. Therefore, a prima facia case has been established by the plaintiff for custody of K.J.A. *Stockwell v. Stockwell*, 116 Idaho 297, 775 P.2d 611, 613 (1989). Once a prima facia case has been established by a biological parent, the burden shifts to the nonparent to establish by clear and convincing evidence that the biological parent is patently unfit to be granted custody of the child. *Id.* The Supreme Court of Kansas stated in *In re Vallimont*, 182 Kan. 334, 340, 321 P.2d 190 (1958) that:

> While the standard of fitness required of parents is difficult to specify without being somewhat ambiguous, conduct which makes a parent unfit may be defined within limits. There is no statutory definition of the word 'unfit.' It therefore must be given its ordinary significance, having due regard to the context. In general, the word means unsuitable, incompetent, or not adapted for a particular use or service. As applied to the relation of rational parents to their child, the word usually although not necessarily imports something of moral delinquency. Parents who treat the child with cruelty or inhumanity, or keep the child in vicious or disreputable surroundings, are said to be unfit. Parents who abandon the child, or neglect or refuse, when able so to do, to provide proper or necessary support and education required by law, or other care necessary for the child's well being are said to be unfit. Violence of temper or inability or indisposition to control unparental traits of character or conduct, might constitute unfitness. So, also, incapacity to appreciate and per-

18

form the obligations resting upon parents might render them unfit, apart from other moral defects.

In the case at bar, the defendants failed to present any evidence establishing that the plaintiff M.A. is an unfit parent. On the contrary, defendant E.J.M. testified that the plaintiff was in fact a fit parent. "[A] parent who is not found to be unfit, has a fundamental right, protected by the Due Process Clause of the United States Constitution, to the care, custody and control of his or her child, and that the right of such a parent to custody of the child cannot be taken away in favor of a third person absent a finding of unfitness on the part of the parent." *Sheppard v. Sheppard*, 230 Kan. 146, 630 P.2d 1121, 1128 *cert. denied*, 455 U.S. 919 (1981).

██ Although a natural parent has a prima facia right to the custody of his or her child, the presumption does not apply after a voluntary forfeiture of custody or a prior decree removing custody from the natural parent and awarding it to a nonparent. *Ex Parte McLendon*, 455 So.2d 863, 865 (Ala. 1984). There is no evidence that the plaintiff M.A. ever intended to give legal custody of K.J.A. to the defendants. Custody of K.J.A. was not transferred to the defendants by any agreement between the plaintiff and the defendants. Indeed, the plaintiff refused to sign proposed change of custody documents presented to her on two separate occasions by the defendants. Therefore, there is no evidence of any voluntary forfeiture of custody in this case. Also, there is no prior decree removing custody from the biological mother, M.A. and awarding it to the defendants. Absent any voluntary forfeiture of custody or any prior decree removing custody from the biological mother M.A., the plaintiff is entitled to the protection provided by the presumption that a natural parent has a prima facie right to the custody of her child.

Defendants rest their entire case on the fact that K.J.A. has lived with them for over two and a half years and knows them to be his parents. Defendants contend that as a result of this extended stay, a strong psychological bond has been developed between the defendants and the child. The defendants expressed a strong concern for the emotional well-being of the child if this bond was to be broken. "There can be no question that stability is important

to a child's welfare, and that in deciding who should have custody of a child, it will therefore always be essential to consider how long the child has spent with the third party." *Hernandez*, 376 A.2d at 660. However, it has also been repeatedly held that the fact that a child has been away from a parent for a long time will not by itself defeat the parent's right to custody. *Id.* The consideration must take into account all the evidence, including the reasons why the child has been so long with the third party. *Id.*

■ In the case at bar, although K.J.A. has been with the defendants for an extended period of time, that lengthy stay was without the consent of the biological mother or the approval of any court of law. Defendants now call upon this Court to consider the extended stay by the minor with the defendants in a light most favorable to them obtaining custody of the minor. The bond between K.J.A. and defendants, which the defendants now seek to use to their advantage, developed over the period of time that K.J.A. was being held against the wishes of his mother. The defendants cannot now use these circumstances of their own creation as the legal basis for depriving plaintiff's right to have the custody of her child. The Court will not condone such acts of deprivation by awarding the custody of a child to a third party over a biological parent because to do so would only encourage such future behavior.

■ Finally, defendants contend that to separate the child from the defendants would cause the child severe emotional trauma. Other than the testimony of the defendant E.J.M., they have produced no expert testimony to support this proposition. While there is no doubt that the child would be hurt by a change in custody, there is no testimony to show that such damage would not be remediable. To deny the plaintiff M.A. physical and legal custody, there must be clear and convincing evidence that the removal of K.J.A. from the defendants home will be detrimental to his welfare. Detriment in this sense means more than the normal trauma caused to a child by uprooting him from familiar surroundings such as often occurs by reason of divorce, death of a parent, or adoption. It contemplates a longer term adverse effect that tran-

20

scends the normal adjustment period in such cases. *Filter vs. Bennett*, 554 So.2d 1184, 1185(Fla. App. 2d Dist. 1989). The record here simply fails to support any such detriment.

## CONCLUSION

In order for a third party to deprive a biological parent of the right to custody of their child, that third party must establish by clear and convincing evidence that the biological parent is unfit. The record is deplete of any evidence that the biological mother of the minor K.J.A. is unfit or in any way incapable of raising and caring for her son. Although a court must consider the emotional ties of the minor with the individuals seeking custody, this case presents a situation where emotional ties were achieved through the wrongful and willful withholding of the minor from his biological parent. Therefore, the Court must weigh this evidence in a light less favorable to the party withholding the child. Furthermore, there has been no showing of irreparable detriment to the child if the biological mother was given custody of the minor. Accordingly, this Court will award custody of the minor K.J.A. to his biological mother, M.A.

ORDER

In accordance with the Memorandum Opinion of even date, it is hereby

ORDERED that the plaintiff M.A. is awarded the full legal and physical custody of her biological son, K.J.A.; and it is further

ORDERED that the defendants J.J.M. and E.J.M. shall have the minor prepared to be picked up from their home at 12 noon on Thursday, June 15, 1995; and it is further

ORDERED that the plaintiff M.A. shall be accompanied by two Marshals of the Territorial Court in order to pickup K.J.A. from the defendants' homes; and it is further

ORDERED that the defendants shall give all relevant documentation concerning the minor to his mother M.A., including, but not limited to: medical records; birth certificates; immunization records; and social security cards; and it is further

21

ORDERED that no party to this custody matter, nor their friends or family, shall do anything to obstruct or in anyway interfere with the pickup K.J.A. by his biological mother on Thursday, June 15, 1995.